**Patrick Richard WEBER;
et al., Plaintiffs,**

v.

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Defendant.**

Civ. No. 3–90–CV–10033.

United States District Court,
S.D. Iowa,
Davenport Division.

July 29, 1994.

See also, 764 F.Supp. 1337.

J. Bryan Schulte, Ruther Bauer Schulte & Hahn, Burlington, IA, Steven J. Crowley, Crowley Law Firm, Burlington, IA, for Robert J. Todd.

J. Bryan Schulte, Ruther Bauer Schulte & Hahn, Burlington, IA, Mary Ann Brown, Bauer Schulte Hahn, Burlington, IA, Steven J. Crowley, Crowley Law Firm, Burlington, IA, for Patrick Richard Weber, Edith Kelly.

Daniel J. Hanson, Henry A. Harmon, Grefe & Sidney, Des Moines, IA, for State Farm Mut. Auto. Ins. Co.

Charles W. Brooke, Noyes & Obrien, Davenport, IA, for Daniel E. Cahill.

J. Bryan Schulte, Ruther Bauer Schulte & Hahn, Burlington, IA, Mary Ann Brown, Bauer Schulte Hahn, Burlington, IA, for Kelly Joseph Weber.

## ORDER

LONGSTAFF, District Judge.

THE COURT HAS BEFORE IT a motion for summary judgment, submitted by the defendant on May 16, 1994. Plaintiffs resisted defendant's motion with a cross-motion for summary judgment on June 10, 1994. The court held a telephonic hearing on July 26, 1994.

## I. BACKGROUND

On November 28, 1988, Richard Weber was driving his car on the highway when he crossed the center line and had a head-on collision with another vehicle. At the time of the accident Richard Weber was accompanied by his wife, Mary Weber, and his three minor sons, Tommy, age nine, Patrick, age thirteen, and Kelly, age seventeen. Richard, Mary and Tommy were killed in the accident. Patrick and Kelly Weber sustained various injuries.

Edith Kelly, grandmother of the Weber children, was appointed guardian and conservator for the surviving minor children, Patrick and Kelly, on December 5, 1988. The defendant states that Robert Todd was retained by the Weber family to represent the legal interests of the three decedents' estates and the two surviving children. (Defendant's Statement of Undisputed Facts p. 1–2). The plaintiffs dispute this, claiming Todd was appointed administrator of the estates by the Iowa District Court and Edith Kelly asked for his assistance in obtaining her appointment as the conservator and guardian for the surviving children. (Plaintiffs' Response to Defendant's Statement of Undisputed Facts pp. 13–14). The plaintiffs state that at Edith Kelly's request Todd did assist with the opening and administration of the guardianships and conservatorships. (Plaintiffs' Response to Defendant's Statement of Undisputed Facts pp. 13–14).

When informed of the accident, State Farm opened files for coverage on collision, medical payments, funeral benefits and uninsured motorist coverage under the Weber automobile policy. (Defendant's Undisputed Facts p. 2). Steve Logan, a State Farm claim representative, was assigned to handle the claims from the Weber collision. (Plaintiffs' Statement of Undisputed Facts p. 2). On December 6, 1988, Logan telephoned Todd and left a message with Todd's secretary that he was handling the file and Todd should contact Logan "when he's ready." (Plaintiffs' Exhibit 118–1). On December 7, 1988, Logan told Todd during a telephone conversation about policy coverage available for the payment of medical expenses, funeral expenses and collision damages. (Plaintiffs'

Statement of Undisputed Facts p. 4, Plaintiffs' Exhibit 118–1). At that time, Logan knew the plaintiffs had potential claims under the insurance policy's uninsured motorist provision, but did not discuss this coverage with Todd. (Defendant's Statement of Undisputed Facts p. 2).

On January 5, 1989, Logan telephoned Todd to arrange a personal meeting. (Plaintiffs' Statement of Undisputed Facts p. 6). Todd and Logan met on January 6, 1989, at Todd's office. The meeting included a discussion of insurance coverage. Although there is some dispute between the parties regarding how and what Todd asked Logan about the family exclusion provision in the policy, both agree that Logan pointed out the family exclusion to liability coverage language to Todd at the meeting. (Defendant's Statement of Undisputed Facts p. 3, Plaintiffs' Statement of Undisputed Facts p. 6). However, Logan did not inform Todd that coverage existed under the uninsured motorist provision of the policy, even though Logan knew that Iowa case law required this coverage. *See Rodman v. State Farm Mutual Auto. Ins. Co.,* 208 N.W.2d 903 (Iowa 1973) (allowing the insured to recover under the uninsured motorist provision of an automobile insurance policy when the insured's recovery would otherwise be barred by a family exclusion in the insurance policy). Logan admits that there was never any doubt that the uninsured motorist coverage applied to the Weber claim. (Plaintiffs' Exhibit D—Logan's Deposition p. 77). State Farm representatives thought that Todd was unaware or did not understand the uninsured motorist coverage under the *Rodman* case. (Defendant's Statement of Undisputed Facts p. 3).

Prior to the January 6, 1989, meeting with Todd, Logan discussed the plaintiffs' coverage under the policy with his supervisor, Lloyd Cleven. Exactly what Cleven instructed Logan regarding disclosure of the uninsured motorist coverage is disputed by the parties. Cleven instructed Logan that he was not obligated to explain the law to attorneys. (Defendant's Statement of Undisputed Facts pp. 3–4).

On April 3, 1989, Edith Kelly hired attorney Daniel Cahill. (Plaintiffs' Statement of Undisputed Facts p. 9). The plaintiffs assert Cahill was hired to investigate possible claims the Weber children had from the November 28, 1988 collision. *Id.* The defendant disputes this, claiming Cahill was hired to investigate insurance coverage for the Weber family. (Defendant's Response to Plaintiffs' Statement of Undisputed Facts p. 5). This Court's examination of Cahill's deposition indicates that he was hired to find money in the form of insurance coverage for the two Weber children. (Plaintiffs' Exhibit I—Cahill's Deposition p. 66). Cahill contacted State Farm on April 7, 1989, requesting a copy of the insurance policy. (Plaintiffs' Exhibit 31—Cahill's Letter). In the letter Cahill stated that he was trying to discover whether the two surviving Weber children had any claim against State Farm. *Id.* Logan wrote back to Cahill on April 10, 1989, stating he did not have a copy of Weber's actual policy, but would enclose a copy of a sample policy containing the same provisions. (Plaintiffs' Statement of Undisputed Facts p. 10). The sample policy Logan sent Cahill highlighted the family exclusion language. *Id. See also* Plaintiffs' Exhibit 33A–6 (showing the highlighted portions of the policy).

A copy of Logan's letter to Cahill was also sent to Cleven. Once Cleven reviewed the copy, he informed Logan that it was necessary to send a follow-up letter disclosing all coverage under the policy. (Plaintiffs' Statement of Undisputed Facts p. 10). Logan sent both Cahill and Todd a letter on May 5, 1989. The parties dispute the clarity of that letter regarding the disclosure of the applicability of uninsured motorist coverage under the policy. Logan wrote a second letter to Cahill on May 16, 1989, which again discussed the uninsured motorist coverage under the policy. A progress report prepared by Logan on May 19, 1989, noted: "I have informed Mr. Cahill that U [uninsured] coverage would apply. Mr. Cahill indicated he was happy that I have responded so quickly to his requests and I got no indication he felt we had tried to hide anything." (Plaintiffs' Exhibit 56). On May 8, 1989, Todd telephoned Logan to ask who Cahill represented. (Plaintiffs' Statement of Undisputed Facts p. 11). Logan wrote in his claim activity log on

May 8, 1989, "Atty Todd ph—got my letter; wanted to know who Cahill represents; also asked if we were paying Mo. clmt. under A. Told him yes! I still don't think he has caught on yet." (Plaintiffs' Exhibit 118–4—Logan's Activity Log).

After receiving the information regarding uninsured motorist coverage, Cahill filed a lawsuit on May 19, 1989, against Richard Weber's estate on behalf of the estates of Mary Weber and Thomas Lee Weber, and the conservatorships of Patrick Weber and Kelly Weber. This case was settled in November, 1989, for $185,000. There is some dispute between the parties as to whether the Webers released all claims under the policy in the settlement, including claims against State Farm. The present suit was filed on March 2, 1990, by the plaintiffs against the defendant alleging first-party bad faith.

## II. DISCUSSION OF APPLICABLE LAW

### A. Summary Judgment

Summary judgment is properly granted when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material.... Factu-

al disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B. First–Party Bad Faith Claims

■ The Iowa Supreme Court has followed the majority of jurisdictions in recognizing a tort claim for first-party bad faith. *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790 (Iowa 1988). First-party bad faith occurs when an insurance company intentionally denies or fails to process its insured's claim without a reasonable basis for that action. *Reuter v. State Farm Mutual Auto. Ins. Co.*, 469 N.W.2d 250, 253 (Iowa 1991) (citing *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978)).

The Iowa Supreme Court has noted that "while an insurer has a fiduciary relationship with its insured, it has an adversarial relationship with a third-party claimant." *Bates v. Allied Mutual Ins. Co.*, 467 N.W.2d 255, 258 (Iowa 1991).[1] The Iowa Supreme Court views insurance contracts as contracts of adhesion because the court believes the bargaining power between the insured and insurer is inherently unequal and this disparity persists throughout the parties' relationship. *Dolan*, 431 N.W.2d at 794. According to the court, first-party bad faith claims help redress this inequality that "becomes particularly acute when the insured sustains a physical injury or economic loss for which coverage is sought." *Id.*

■ To establish a claim for first-party bad faith against an insurer who has denied or delayed processing a claim, the plaintiff must first demonstrate the absence of a reasonable basis for denying or delaying benefits under the policy. *Dolan*, 431 N.W.2d at 794 (citing *Anderson* 271 N.W.2d at 376). Second, the plaintiff must demonstrate the defendant insurance company knew or had reason to know that its denial was without a reasonable basis. *Wetherbee v. Economy Fire & Casualty Co.*, 508 N.W.2d 657, 662 (Iowa 1993). "A reasonable basis to deny a claim exists when a claim is fairly debatable."

---

1. In making this distinction, the court discussed its refusal to recognize a cause of action permitting a third party to bring a bad faith claim against the insurer for refusal to settle a liability claim against the insured. *Bates,* 467 N.W.2d at 258. The court compared that type of situation

where the insurer has an adversarial relationship with the third party claimant to third-party excess judgment claims and first-party bad faith claims where the insurer has a fiduciary relationship with the insured. *Id.*

*Id.* The court is to determine, as a matter of law, whether a claim is "fairly debatable." *Id.* An insurer cannot be held liable for bad faith if an objectively reasonable basis for denying the claim exists. *Reuter,* 469 N.W.2d at 254.

State Farm does not argue its obligation to pay the uninsured motorist benefits to the Webers was fairly debatable. By State Farm's own admission, no questions on coverage existed for denying or failing to process the Webers' claims. State Farm admits it "knew the Weber passengers were entitled to uninsured motorist coverage benefits under the insurance policy." (Defendant's Brief p. 6).

State Farm admits that "[p]rior to the May 4, 1989 letter, State Farm knew that attorney Todd was unaware or did not understand how the law under *Rodman* and its progeny applied to provide [uninsured] coverage under the Weber policy." (Defendant's Brief p. 7). From December, 1988, when State Farm became aware of Todd's representation of the plaintiffs, until after attorney Cahill became involved, State Farm made no attempt to inform the Webers or the attorneys about the uninsured motorist coverage under the policy.

**C. Duty of Insurance Company to Disclose Applicable Coverage**

■ While conceding that the Webers were owed benefits under the insurance policy, State Farm claims that the Webers cannot maintain a bad faith claim because its actions were not unreasonable. The crux of State Farm's argument rests on the proposition that State Farm owed no duty to explain the law to the insureds' attorney Todd, regarding coverage under the insurance policy. State Farm argues an insurer has a good faith duty to disclose, counsel, and advise the insured only where the insurer knows the insured is relying solely on the insurer for advice and this duty does not arise where the insurer knows the insured is not relying solely on the insurer's advice. (Defendant's Brief p. 11). Therefore, State Farm argues that failure to advise and counsel Todd was not unreasonable and should not be considered bad faith.[2]

**D. Factors Considered in Evaluating Duty to Disclose**

**1. The Duty of Good Faith and Fair Dealing**

"In both first-party and third-party situations, the duty of good faith arises out of the

---

**2.** To support this proposition, State Farm cites several state court cases from foreign jurisdictions, *Dercoli v. Pennsylvania National Mutual Ins. Co.,* 520 Pa. 471, 554 A.2d 906 (1989), and *Miller v. Keystone Ins. Co.,* 535 Pa. 531, 636 A.2d 1109 (1994), neither of which are directly analogous to the present case.

*Dercoli* did not say that an insurance company has no duty of good faith when the insured has independent legal counsel, but merely that the insurance company's duty to deal in good faith is even higher when the insurance company is advising the insured. According to the *Dercoli* court, "[t]he duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim ... *This is especially true* where the insurer undertakes to advise and counsel the insured in the insured's claim for benefits." *Dercoli,* 554 A.2d at 909 (emphasis added).

State Farm's citation to *Miller* is also inapplicable to the present case. *Miller* involved a claim for post-mortem work loss benefits under Pennsylvania's No–Fault Motor Vehicle Insurance Act which was later repealed. *Id.,* 636 A.2d

at 1110. The claimant brought the suit for work loss benefits after the statute of limitations under the No–Fault Act had run. *Id.* at 1113. The *Miller* court reaffirmed earlier holdings, finding that "in the absence of fraud, intentional deception, or the making of misleading statements, the employer has no affirmative duty to apprise a compensation claimant of any or all available benefits." *Id.* The *Miller* court noted that this holding was consistent with prior decisions where the court declined to create a judicial remedy for the insurer's bad faith conduct under the No–Fault Act. *Id.* at 1113. Thus, no bad faith recovery existed at the time under Pennsylvania's No Fault Act. However, at the time of the present case, Iowa had recognized recovery for insureds under a first-party bad faith claim against an insurance company.

Furthermore, until legislation in 1990, Pennsylvania did not recognize a cause of action for an insurer's bad faith dealings with an insured. *American International Underwriters Corp. v. Zurn Industries, Inc.,* 771 F.Supp. 690 (W.D.Pa. 1991). Pennsylvania's statutory cause of action for bad faith does not apply to actions taken before its effective date of July 1, 1990. *Id.* In both *Miller* and *Dercoli* the insurance companies' action occurred prior to July 1, 1990.

insurance contract and runs from the insurer to the insured." *Chadima v. National Fidelity Life Insurance Co.,* 848 F.Supp. 1418, 1429 (S.D.Iowa 1994). Other courts have noted that the insurance contract and the nature of the relationship between the insured and insurer in both first-party claims and third-party claims "give the insurer an almost adjudicatory responsibility." *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 569 (1986). Implicit in the relationship and the contract "is the insurer's obligation to play fairly with its insured." *Id.* at 570. Other courts have also noted that "an insurer has a duty to disclose policy terms to its insureds." *Ramirez v. USAA Casualty Ins. Co.,* 234 Cal.App.3d 391, 399, 285 Cal.Rptr. 757 (1991). This disclosure obligation is particularly important where the insured's lack of knowledge may result in lost benefits or forfeited rights. *Id.* In *Ramirez,* the court stated the insurer's duty to disclose did not change even though the insurer dealt with the insured's attorneys rather than with the insured directly. *Id.* at 400, 285 Cal.Rptr. 757.

### 2. The Existence of an Adversarial Relationship Between the Insured and the Insurer

There are no Iowa cases directly on point to determine whether the insurance company's duty to disclose coverage to an insured changes when the insured has hired an attorney. However, examination of the Iowa case law involving claims against the insurance company for false or negligent misrepresen-

tations indicates that an important factor is whether an adversarial relationship existed between the insured and the insurance company at the time of the alleged misrepresentation.[3] *See Bates,* 467 N.W.2d at 258 (noting in first-party bad faith cases the insurer has a fiduciary relationship with the insured, while the insurer has an adversarial relationship with a third-party claimant). In the present case, however, no adversarial relationship existed between the insureds and the insurance company at the time Logan met with Todd on January 7, 1989. Logan's log book states that he phoned Todd and told Todd's secretary "I am handling file and to contact me when he's ready." (Plaintiffs' Exhibit 118–1). An adversarial relationship did not clearly exist between the plaintiffs and the defendant until May 19, 1989, when Cahill filed a lawsuit against Richard Weber on behalf of the estates of Mary and Thomas Weber and the conservatorships of Patrick Weber and Kelly Weber seeking recovery for personal injury.

### 3. Ability of a Reasonably Competent Attorney to Discover Coverage Under the Policy

■ Defendant argues its representatives provided documentation on two separate occasions "which would have lead a reasonably competent attorney to conclude that underinsured motorist provisions applied." (Defendant's Brief p. 16). The documentation provided by the defendant, included a Coverage Information Index Card and a copy of the insurance policy. (Defendant's Brief p. 16–

---

**3.** In *Kirk v. Farm and City Ins.,* 457 N.W.2d 906 (Iowa 1990) the parents and the estate of Vance Kirk who was killed in a one car accident sued the insurance company for failure to pay uninsured motorist benefits. The decedent's parents retained an attorney who dealt with the insurance company. *Id.* at 907. The insurance adjuster offered to pay $10,000, half the policy amount. *Id.* The adjuster refused to make full payment because he felt there was some question as to who was driving and because of the possibility that any recovery on the decedent's behalf could be reduced because of his contributory fault. *Id.* The plaintiffs' attorney rejected this settlement offer and demanded full payment. *Id.* at 908.

Eventually the parents and the estate administrator filed suit against the insurance company. *Id.* Among the theories of recovery advanced, the administrator argued that the adjuster made false, fraudulent or negligent representations

during the settlement negotiations. *Id.* at 909. The court rejected this theory because the court found no substantial evidence of reliance by the plaintiffs. *Id.* at 910. In making this determination, the court noted that the relationship between the insurance company and the plaintiffs was confrontational from the beginning. *Id.* According to the court, the plaintiffs' attorney "made it clear that it was an adversarial relationship, announcing early in their negotiations that if, [the insurer] did not comply with his demands suit would be filed." *Id.*

The court did not give as a reason for rejecting the plaintiffs' claim the fact that the plaintiffs were represented by an attorney and the insurer had no duty to disclose. Instead, the court rejected the plaintiffs' claim because an adversarial relationship existed from the beginning between the plaintiffs and the insurer. Thus, the plaintiffs could not claim to have justifiably relied on the insurer's representations.

17). However, neither of these documents discussed the applicable coverage under the *Rodman* case, and the coverage could not be ascertained merely by reference to the policy itself. Furthermore, this argument is inconsistent with the statements of Logan, that in his opinion, very few people knew about the *Rodman* case law. (Plaintiffs' Exhibit D, Logan's Deposition p. 95). Finally, when Logan consulted with the defendant's own local attorney, Gene Krekel, regarding how to proceed on the uninsured motorist claims, Krekel was unaware that the uninsured motorist coverage would apply. (Plaintiffs' Exhibit 25—Status Report prepared by Logan).[4]

### 4. Statutory Duties Imposed on Insurance Companies in Settlement

Iowa Code § 507B.4(9) discusses unfair claim settlement practices for insurance com-

panies. This section of the code states, in relevant part:

> Committing or performing with such frequency as to indicate a general business practice any of the following:
>
> e. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.
>
> f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear ...

**Iowa Code** § 507B.4(9) (1993). By enacting this statute the Iowa Legislature has indicated these types of practices are disfavored. Here, liability was reasonably clear, and yet State Farm did not attempt to promptly provide uninsured motorist coverage infor-

---

4. State Farm's citation to *Wedzeb Enterprises, Inc. v. Aetna Life and Casualty Co.*, 570 N.E.2d 60, 61 (1991) is also inapplicable to the present case. In *Wedzeb* the court held that when the insured is represented by counsel and the insured and the insurer are engaged in coverage litigation, the insurer does not have an obligation to determine whether the insured is aware of all sections in the insurance policy which may provide potential coverage. *Id.* However, the court in *Wedzeb* noted "[t]his is not a case where the insurer knew the insured had sustained a particular injury, knew the policy covered that particular injury, and yet failed to inform the insured of this fact." *Id.* at 63–64. Here, State Farm knew of the injury and that coverage applied and yet did not inform the insured until a second attorney was hired, nearly five months later. During those five months there was no coverage litigation between State Farm and the plaintiffs. Furthermore, the liability of the insurer was unclear at the time the insured signed the release in *Wedzeb*. *Id.* at 63. The insurer does not have a duty to inform an insured of coverage which may not even exist. *Id.* In the present case, there was no question as to the existence of coverage under the policy.

State Farm also relies on *Schoonover v. American Family Insurance*, 214 Ill.App.3d 33, 157 Ill.Dec. 794, 802, 572 N.E.2d 1258, 1266 (1991), *appeal after remand*, 230 Ill.App.3d 65, 172 Ill. Dec. 167, 595 N.E.2d 230 (1992), to argue that some courts hold that the insurer has no duty other than to deliver the insured a copy of the policy when the insured has retained counsel. In *Schoonover* the court indicated that a factor in the decision to grant summary judgment for the defendant insurance company was the fact that the plaintiff had an attorney during a significant portion of the policy's limitation period. *Id.*

However, *Schoonover* is distinguishable from the case at bar because in *Schoonover* neither the insured or the insured's attorney asked the insurance company for a copy of the insurance policy. *Id.*, 157 Ill.Dec. at 802, 572 N.E.2d at 1266. As the court in *Schoonover* noted, "[i]t is inconceivable that plaintiff's attorney was unaware of the existence of the policy or unaware that the policy should be consulted when he was contemplating filing suit to enforce its provisions." *Id.* at 801, 572 N.E.2d at 1265. Here, Todd was given a copy of the insurance policy which he copied, but the applicable coverage was not apparent from the face of the policy.

The defendant also cites *Advanced Methods, Inc. v. Grain Dealers Mut. Ins. Co.*, 274 F.2d 634, 636 (7th Cir.1960). In *Advanced Methods* the insured hired an attorney who sent letters to the insurance company demanding prompt payment and threatening litigation. *Id.* The attorney never requested the insurer furnish a copy of the insurance policy and no evidence was produced that the insured was in any way mislead. *Id.* at 637. The court rejected the insured's argument that a positive duty implied by law exists requiring the insurance company to inform the insured of agreed forfeiture conditions, such as a twelve month limitation clause. *Id.* at 637. The court held that under these facts, an insurer has no duty to forward a copy of the agreed forfeiture conditions to the insured where an insured retained attorneys who threatened to sue insurer. *Id.* However, in the present case, nothing in the record indicates either Todd or Cahill threatened to sue State Farm prior to May, 1989. There is no evidence that an adversarial relationship existed between the insured or the insureds' attorneys and State Farm until the plaintiffs filed the suit against Richard Weber's estate on May 19, 1989.

mation regarding the Webers' claims because State Farm maintains that it had no duty to inform the insureds' attorney of the coverage. Such an argument is counter to the purpose of the Iowa Code in affecting "prompt, fair and equitable settlements when liability has become reasonably clear." **Iowa Code** § 507B.4(9)(f) (1993).

### E. Concealment or Fraudulent Nondisclosure

#### 1. Whether Plaintiffs Adequately Plead Fraudulent Nondisclosure

The plaintiffs in their cross-motion for summary judgment seek partial summary judgment on their claim of fraudulent nondisclosure. The Court finds that the plaintiffs' first amended complaint filed November 30, 1990, which has not been subsequently amended, arguably only sets forth only a claim of bad faith accompanied by a request for exemplary damages. In paragraph seven of the amended complaint, however, the plaintiffs argue State Farm breached its duty of good faith and fair dealing by intentionally failing to disclose coverage and by unreasonably dealing and withholding payment of benefits. Although the pleading is not a model of clarity, the defendant replied to this issue in its brief and the Court finds plain-

tiffs have plead a claim for fraudulent nondisclosure. A finding to the contrary would simply result in the plaintiffs seeking an amendment. Because the defendant has not been unfairly surprised, the Court finds the nondisclosure claim was plead.

#### 2. Duty to Disclose

The plaintiffs argue the defendant had a duty to disclose the coverage and failure to do so constituted fraudulent nondisclosure. In claims for fraudulent misrepresentation the Iowa Supreme Court has held that "a representation need not be an affirmative misstatement; it can arise as easily from a failure to disclose material facts." *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987). *See also Cornell V. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987) (stating concealment of or failure to disclose a material fact can constitute fraud). The Iowa Civil Jury Instructions 810.2 set forth the elements a party must prove to recover on a claim for fraudulent nondisclosure.[5] For the misrepresentation or concealment to be actionable, the party charged with fraud must have a legal duty to communicate the matter to the other party. *Id.* The Iowa Civil Jury Instructions 810.2 cite as authority Restatement (Second) of Torts § 551.[6] Generally, the court must determine as a matter of law

---

**5.** The elements for fraudulent nondisclosure in Iowa Civil Jury Instruction 810.2 are:

  1. Special circumstances existed which gave rise to a duty of disclosure between the plaintiff and the defendant. (*Describe the relationship found to give rise to a duty of disclosure*).
  2. While such relationship existed, the defendant [was aware of the following facts] [intended the following course of action] (*state the facts or intent alleged to have been withheld*).
  3. While such relationship existed, the defendant concealed or failed to disclose [the knowledge or intent alleged to have been withheld].
  4. The undisclosed information was material to the transaction.
  5. The defendant knowingly failed to make the disclosure.
  6. The defendant intended to deceive the plaintiff by withholding such information.
  7. The plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance.
  8. The failure to disclose was a proximate cause of the plaintiff's damage.
  9. The nature and extent of the plaintiff's damage.

Iowa Civil Jury Instructions 810.2 (1994). The plaintiff must prove all of these elements to recover under a fraudulent nondisclosure claim.

**6.** Restatement (Second) of Torts § 551 provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transactions is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

whether the circumstances exist which give rise to a duty of disclosure. Restatement (Second) of Torts § 551 cmt. (m) (1977).

According the Restatement (Second) of Torts § 551(2)(a), a party to a business transaction has a duty to disclose "matters known to him that the other is entitled to know because of fiduciary or other similar relation of trust and confidence between them." This Court concludes that under the circumstances of this case, the defendant was under a duty to exercise reasonable care to disclose the uninsured motorist coverage. While retention of an attorney by the plaintiffs may arguably diminish the duty to disclose coverage, the duty was not extinguished.

## III. CONCLUSION

Based on the foregoing discussion the Court finds as follows:

1. Defendant's motion for summary judgment is denied.

2. Plaintiffs' motion for summary judgment is granted to the extent the Court finds the uninsured motorist coverage under the policy was not fairly debatable and the retention of counsel by plaintiffs did not extinguish the defendant's duty to disclose that coverage.

3. Plaintiffs' motion for summary judgment is also granted to the extent that in connection with the fraudulent nondisclosure claim the defendant was under a duty to exercise reasonable care to disclose the uninsured motorist coverage provisions of the policy.

Insofar as the plaintiffs' motion seeks further relief, it is denied.

IT IS SO ORDERED.

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.
*Restatement (Second) of Torts* § 551.