# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1302

_____

| | | |
|---|---|---|
| BBSerCo, Inc., a Colorado | * | |
| Corporation, #84-1291855 | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Metrix Company, | * | Appeal from the United States |
| | * | District Court for the Northern |
| Defendant, | * | District of Iowa. |
| | * | |
| Green Bay Dressed Beef, Inc., | * | |
| | * | |
| Defendant-Appellant, | * | |
| | * | |
| John Schoen, | * | |
| | * | |
| Defendant. | * | |

_____

Submitted:  May 13, 2002

Filed:  February 3, 2003
_____

Before BOWMAN and BYE, Circuit Judges, and NANGLE,[1] District Judge.
_____

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

BYE, Circuit Judge.

This dispute arises from a failed joint venture to produce and market fetal bovine serum. Green Bay Dressed Beef, Inc., (Green Bay) appeals from a final order of the district court[2] denying its motion for judgment as a matter of law (JAML) and upholding a jury verdict on breach of contract and fraud claims in favor of BBSerCo, Inc. We affirm.

I

Because BBSerCo prevailed at trial, we must view the factual record in the light most favorable to and give it the benefit of all reasonable inferences the record will support. See Fletcher v. Price Chopper Foods of Trumann, Inc., 220 F.3d 871, 873 (8th Cir. 2000).

Fetal bovine serum is a product used in cell culture research, the production of pharmaceuticals, and veterinary medicine. Fetal bovine serum comes from the blood of fetal calves — those calves found in the wombs of the small percentage of pregnant cows brought to slaughter. Fetal calf blood is largely protected from infection, and therefore has no antibodies to interfere with cell culture applications.

Fetal calf blood is processed into serum by removing red blood cells. This "raw" serum is then filtered to remove any bacteria and becomes "sterile" serum, the finished product. World-wide demand for sterile serum is relatively static, with about 500,000 liters consumed per year. The supply, on the other hand, fluctuates a great deal. When the beef industry is strong, few pregnant cows are slaughtered and the supply of fetal blood drops. Consequently, the price for fetal bovine serum rises.

[2]The Honorable John A. Jarvey, United States Magistrate Judge for the Northern District of Iowa, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c).

When economic or natural pressures cause reductions in herd size (e.g., drought conditions), more pregnant cows are slaughtered and the supply of fetal blood increases, driving the price of fetal bovine serum down. Because of these market dynamics, relatively few companies produce serum. Two companies alone are responsible for about half of all world-wide sales of sterile serum, Life Technologies (30%) and HyClone (20%). Similarly, there are relatively few companies which produce raw serum. The Metrix Company (Metrix), an Illinois corporation doing business in Dubuque, Iowa, is America's largest producer of raw serum.

Typically, slaughterhouses do not process fetal calf blood into serum. They merely sell their blood to producers like Metrix. But in 1994, Wendell Leinweber and George (Skip) Wrape, two individuals with many years of experience in this field, formed BBSerCo with the idea of partnering with slaughterhouses to process serum. BBSerCo would charge a fixed fee to produce and sell raw serum on behalf of a slaughterhouse. That way, BBSerCo would realize a steady income regardless of the fluctuations in the serum market. Without having to finance inventory by purchasing blood, BBSerCo could survive as a new and relatively small player in the market. The slaughterhouse would profit too. It could more easily ride the ups and downs of the serum market, and increase its overall profit margin by selling serum instead of blood when the market was good. The idea was that both parties would win in the long run.

BBSerCo planned to enter joint venture agreements with sixteen slaughterhouses. It first approached Green Bay, a large Wisconsin slaughterhouse. In early 1995, the parties struck a deal. BBSerCo would produce and sell raw serum on Green Bay's behalf for a $28 per liter processing fee. In the beginning, the joint venture worked well. Raw serum was selling as high as $192 per liter. After subtracting BBSerCo's processing fee, Green Bay still realized a profit significantly higher than it would have by selling blood to producers at about $90 per liter.

The good times quickly dissipated, however. Drought and other factors affecting the beef industry caused record cattle kills in 1996 and 1997. The price of serum tumbled, and the joint venture began to unravel. Green Bay eventually demanded a floor price, $120 per liter, at which BBSerCo had to sell the serum. When the market would not bear that price, the joint venture's inventory of serum built up and BBSerCo collected no processing fees. By December 1996, BBSerCo could no longer service its bank debt. It discontinued processing blood for the joint venture with over 11,000 liters of serum in inventory.

The two parties met to decide what to do about the inventory. Green Bay insisted the serum be sold, whether by Green Bay or BBSerCo. In January 1997, control of the inventory switched from BBSerCo to Green Bay. Although the inventory remained in the same cold storage facility, it moved from BBSerCo's account into Green Bay's account. BBSerCo's bank insisted, however, that the proceeds of all sales, whether made by BBSerCo or Green Bay, continue to go into BBSerCo's account and applied to outstanding loan obligations. The parties agreed to have the bank deduct BBSerCo's processing fees from the proceeds of all sales, then send the remaining proceeds to Green Bay.

On June 13, 1997, Green Bay secretly agreed to sell the entire inventory to Metrix, without paying BBSerCo's processing fees. But there was a catch. Each batch of inventory had a corresponding sample that had to be tested before a buyer could resell the serum. BBSerCo had the samples. Green Bay had no experience in selling serum, and did not fully realize the importance of the samples. Green Bay shipped sixteen liters of inventory to Metrix, thinking Metrix could use those for testing.

On July 30, Metrix called Leinweber at BBSerCo to ask about the BBSerCo-labeled serum it had just received from Green Bay. Leinweber told Metrix he knew nothing about the delivery. Leinweber then called Green Bay's implementation

manager, Wayne Krueger, and asked whether Green Bay knew of any prospective sales. Even though Krueger knew about the delivery to Metrix, and about Green Bay's agreement to sell to Metrix, he told Leinweber he was unaware of any interest.

On July 31, Green Bay realized it could not complete the sale without the samples, so Krueger called Leinweber to find out where the samples were. Leinweber told him BBSerCo had the samples in Colorado, and asked Krueger again whether Green Bay knew of any interest in the serum. Krueger again denied Green Bay's awareness of a possible sale. Since Green Bay did not have access to the samples, Krueger called Leinweber back later asking him to send all the samples to Metrix. When Krueger mentioned Metrix, Leinweber asked him about the small amount of inventory that Green Bay sent to Metrix. Krueger implied he was unaware of the details of that transaction. Leinweber told Krueger some of the inventory was already "out on test," meaning other customers were testing the samples for a possible purchase. It was bad business to send out samples on the same batch to more than one customer at a time without informing the later customer the product was being considered by someone else. But since Green Bay wanted all the samples, and Leinweber did not know Green Bay had already secretly agreed to sell the entire inventory to Metrix and cut BBSerCo out of the deal, Leinweber agreed to send all samples to Metrix.

On August 1, Leinweber faxed a letter to Green Bay discussing the small shipment of inventory to Metrix, his understanding that Metrix wanted to test all the samples, and expressing BBSerCo's continued faith in Green Bay as its business partner:

> I'm assuming that BBSerCo was taken out of the loop initially as an oversight. Such oversight was the result of seeing an opportunity to make a quick sale. . . . Lets work closer together on this [potential sale to Metrix] to make sure everything that is required by [Metrix] is addressed. I will remain in contact with them to make sure any

questions or additional data they required is provided.  I will keep you informed on the progress as it happens.

Leinweber's fax also informed Green Bay that BBSerCo had successfully sold a portion of the inventory, and was wiring $127,296 to Green Bay's account.  An hour after receiving the fax, Green Bay's COO, Wayne Matzke, called Leinweber to thank him for the wired money and assured him that BBSerCo was not "being taken out of the loop."

But on August 15, after all the remaining serum had been shipped to Metrix, Matzke called Leinweber and told him about the Metrix sale.  Matzke also told Leinweber that Green Bay had no intention of  paying BBSerCo's processing fees, which would have totaled $202,560.  Over the next several weeks, BBSerCo negotiated with both Green Bay and Metrix to get paid its processing fees.  On September 4, 1997, when those attempts failed, Metrix wired its entire payment directly to Green Bay.

BBSerCo immediately sued Metrix, its principal owner John Schoen, and Green Bay in Iowa state court.  Green Bay removed the case to federal district court.  The case was tried seven days before a jury.  At the close of evidence and before submitting the case to the jury, the district court granted Metrix's and Schoen's motions for JAML.

The jury considered three of BBSerCo's claims against Green Bay — breach of contract, fraudulent misrepresentation, and fraudulent nondisclosure — and found in BBSerCo's favor on the fraudulent nondisclosure and contract claims.  The jury awarded $202,560 in processing fees, $86,522 in lost profits, $33,681 in interest, and $100,000 in punitive damages.  Green Bay brought a post-trial motion for JAML, which the district court denied.

Green Bay appeals the denial of its motion for JAML on the fraudulent nondisclosure claim, contending the district court erred in submitting both breach of contract and fraud claims to the jury and BBSerCo's relief should be limited to its contract damages, or $202,560. In the alternative, Green Bay challenges the sufficiency of the evidence, contending there was insufficient proof of detrimental reliance on fraud, and insufficient proof of any additional damage being caused by the fraud.

II

Green Bay first contends the district court erred in submitting both breach of contract and fraud claims to the jury. Because Green Bay did not object to the jury instructions given by the district court, and in fact submitted its own suggested instructions on both the breach of contract and fraud claims, we review this contention for plain error. Chem-Trend, Inc. v. Newport Indus., Inc., 279 F.3d 625, 629 (8th Cir. 2002). "Plain error review is narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The verdict should be reversed only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." Id. (internal citations and quotations omitted).

The district court did not plainly err by submitting both the contract and fraudulent nondisclosure claims to the jury. We start from the premise that "concealment of or failure to disclose a material fact can constitute fraud in Iowa." Cornell v. Wunschel, 408 N.W.2d 369, 374 (Iowa 1987).[3] Further, such a fraud claim

---

[3]Neither side contends the law of a state other than Iowa applies to this dispute between a Colorado corporation and a Delaware corporation doing business in Wisconsin. Thus, because Iowa was the forum state, its laws apply by default. See Wood v. Mid-Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal

is not barred simply because the failure to disclose relates directly to a term covered by a contract. See, e.g., Clark v. McDaniel, 546 N.W.2d 590, 592 (Iowa 1996) (recognizing a fraudulent nondisclosure claim arising from a contractual relationship). The key to determining whether contracting parties may be liable to one another for a fraudulent nondisclosure is whether "special circumstances" exist which give rise to a duty to disclose. Jones Distrib. Co., Inc. v. White Consol. Indus., 943 F.Supp. 1445, 1473 (N.D. Iowa 1996).

Green Bay concedes it engaged in a joint venture with BBSerCo. Under Iowa law, parties engaged in a joint venture have more than a mere contractual relationship, they owe fiduciary duties to one another. See Hum v. Ulrich, 458 N.W.2d 615, 617 (Iowa Ct. App. 1990) ("A fiduciary relationship exists between joint venturers"). "There is no question but joint venturers like partners owe the duty of finest loyalty and such loyalty continues throughout the life of the venture and its dissolution." Greenberg v. Alter Co., 124 N.W.2d 438, 440 (Iowa 1963). The existence of this fiduciary relationship triggered a duty to disclose that would not otherwise have existed between these parties by virtue of their contractual relationship. See Sinnard v. Roach, 414 N.W.2d 100, 104 (Iowa 1987) (holding the special circumstances triggering a duty to disclose arise from a "relation of trust, from confidence, from inequity of condition and knowledge or other attendant circumstances") (citations omitted). Thus, the special circumstances required by Iowa law to support a fraud claim were present, and the district court properly instructed the jury on both the contract and fraud claim.

Green Bay next contends there was insufficient evidence to support the fraudulent nondisclosure claim. "We review the denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court, to determine

court simply applies the law of the state in which the federal court sits").

whether sufficient evidence existed to support the jury's verdict." <u>Duty v. Norton-Alcoa Proppants</u>, 293 F.3d 481, 488 (8th Cir. 2002).

> [J]udges must be extremely guarded in granting judgments as a matter of law after a jury verdict. As this court has often repeated, the standard to be applied is as follows: [T]he district court must (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

<u>Ryther v. KARE 11</u>, 108 F.3d 832, 844 (8th Cir. 1997) (citations omitted).

Green Bay contends BBSerCo presented insufficient evidence that it relied on Green Bay's fraud. Since detrimental reliance is one of the elements of a fraudulent nondisclosure claim under Iowa law, <u>see, e.g.</u>, <u>Weber v. State Farm Mut. Auto. Ins. Co.</u>, 873 F.Supp. 201, 208 n.5 (S.D. Iowa 1994), Green Bay claims the district court erred when it denied the motion for JAML. We disagree.

When viewed in the light most favorable to BBSerCo, the evidence supports the claim that, as early as June 13, 1997, Green Bay secretly agreed to sell the joint venture's entire inventory of serum to Metrix without paying BBSerCo's processing fees. Twice thereafter, on July 30 and 31, Green Bay failed to disclose the existence of the sale in response to direct inquiries by BBSerCo about prospective or possible sales. Green Bay also failed to disclose the fact that it had no intention of paying BBSerCo's processing fees upon the completion of the sale. Unaware that its business partner and joint venturer had no intention of paying the processing fees, BBSerCo gave up its only safeguard when it agreed to ship the serum samples to

Metrix, allowing Green Bay to complete the sale. From this evidence, the jury could clearly find that BBSerCo relied to its detriment on the fraud when it shipped the serum samples.

Next, Green Bay challenges the jury's verdict for the noncontractual consequential damages, that is, lost profits in the amount of $86,522, and interest damages in the amount of $33,681. Green Bay contends that even if the district court did not plainly err by instructing the jury on both breach of contract and fraud claims, and even if BBSerCo offered sufficient evidence of fraud, BBSerCo failed to prove the fraud caused damage beyond the contract damages of $202,560. Under the standard for evaluating the denial of a JAML motion, we cannot disturb the jury's consequential damage awards unless "*there is a complete absence of probative facts to support the conclusion reached.*" Ryther v. KARE 11, 108 F.3d at 845 (emphasis in original).

Iowa law allows recovery of lost profits on a fraud claim. E.g., Midwest Home Distrib., Inc. v. Domco Indus. Ltd., 585 N.W.2d 735, 742 (Iowa 1998). "The Iowa Supreme Court has rejected the argument that a plaintiff must identify specific lost sales to recover lost profits damages. Decreased income after the defendant's damaging conduct is sufficient to support an award for lost profits so long as the record discloses a reasonable basis from which the amount can be inferred or approximated." Lundell Mfg. Co., Inc. v. Am. Broad. Cos., Inc., 98 F.3d 351, 365 (8th Cir. 1996) (citing Page County Appliance Ctr., Inc. v. Honeywell, Inc., 347 N.W.2d 171, 178 (Iowa 1984)).

We have previously recognized the somewhat liberal approach Iowa has toward allowing juries to decide lost profit claims:

> If the mind of the court is certain that profits would have been made if there had been no breach by the defendant, there will be a greater degree

of liberality in allowing the jury to bring in a verdict for the plaintiff, even though the amount of profits prevented is scarcely subject to proof at all. In this respect, at least, doubts will generally be resolved in favor of the party who has certainly been injured and against the party committing the breach. *The trial court has a large amount of discretion in determining whether to submit the question of profits to the jury; and when it is so submitted, the jury will also have a large amount of discretion in determining the amount of its verdict.*

Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634, 643 (8th Cir. 1975) (quoting 5 Corbin on Contracts § 1022 (1964)) (emphasis added); see also Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp., 535 N.W.2d 149, 157 (Iowa Ct. App. 1995) (holding lost profits claimant "is only required to present such evidence as might reasonably be expected to be available under the circumstances") (internal quotations omitted).

When viewed in the light most favorable to BBSerCo, the evidence supports the jury's determination that BBSerCo had decreased income after Green Bay's fraudulent conduct, and lost profits during the two-year period between July 31, 1997 (the final date of the fraud) and June 28, 1999 (the first date of trial). Skip Wrape introduced BBSerCo's lost profits evidence. He introduced BBSerCo's tax returns from the years 1995, 1996, and 1997, as well as projections for 1998 and part of 1999 (through the time of trial). Appellee's App. at 101-60. The 1995, 1996, and 1997 tax returns showed BBSerCo progressed from an initial start-up loss of $142,000 in 1995, id. at 111, to a smaller loss of $88,000 in 1996, id. at 125, and finally turned a profit of $71,000 in its third year of operation. Id. at 143. The $71,000 profit was based on nine months of operation prior to the time Green Bay's failure to pay the processing fees disrupted BBSerCo's financing with its bank. Trial Trans. at 862, 877.

We believe BBSerCo's historical performance prior to Green Bay's fraud, as shown by the tax returns, was sufficient to prove BBSerCo suffered lost profits as a

result of the fraud. "The fact that plaintiff's business was relatively new would not, in and of itself, require that evidence of lost profits be excluded since such profits may be awarded where evidence demonstrates its feasibility." Mid-Country Meats, Inc. v. Woodruff-Evans Const., 334 N.W.2d 332, 337 (Iowa Ct. App. 1983) (holding lost profits claim should have been submitted to jury in case involving four-month old company); see also Employee Benefits Plus, 535 N.W.2d at 156-57 (upholding lost profits claim in favor of three year-old company that had never turned a profit). The tax return evidence supports the jury's determination that BBSerCo would have continued to progress if Green Bay's fraud had not disrupted its business plan and financing obligations. And Green Bay could foresee that its conduct would cause BBSerCo lost profits, because Green Bay knew BBSerCo had pledged the unpaid processing fees towards its loan obligations.

Wrape also gave specific testimony about the effect of Green Bay's fraud on BBSerCo's business plan. When Green Bay's failure to pay the processing fee disrupted BBSerCo's financing, BBSerCo had to lay off workers in its New York lab, and sell a company truck and other equipment, in order to meet its loan obligations. Trial Trans. at 855. The New York lay-off prevented BBSerCo from collecting newborn calf serum it otherwise would have collected and produced in New York. Id. BBSerCo also lost the capital needed to develop processing relationships it had planned with two slaughterhouses in Washington and Colorado. Id. at 857-58. Wrape provided the jury with specific information about the amount of fetal bovine serum, newborn calf serum, and calf serum BBSerCo planned to produce and sell in its New York, Washington, and Colorado operations. Id. at 861-62. He based his gross profit calculations on realistic market prices for the three types of serum, id., and relied on his experience in the industry and BBSerCo's own historical figures to calculate the costs of production. Id. at 864-74. Based on these detailed calculations, Wrape projected total lost profits of $160,686. Appellee's App. at 96, 100 ( Plaintiff's Trial Exhibit 46).

-12-

Wrape had some thirteen years in the serum processing industry when he and Leinweber formed BBSerCo. Trial Trans. at 830. Based on such experience, the district court did not abuse its discretion in allowing Wrape's testimony. Cf. Netteland v. Farm Bureau Life Ins. Co., 510 N.W.2d 162, 167 (Iowa Ct. App. 1983) (upholding jury's award of lost profits damages in case where company owner calculated lost profits claim based on his experience in the business). Once the testimony was admitted, the jury was free to credit or discount it. "It is axiomatic that '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Brown v. Sandals Resorts Int'l, 284 F.3d 949, 954 (8th Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). We should not disturb the district court's decision to allow this testimony given the standard of review we must apply; nor should we disturb the jury's award of $86,522, given the "large amount of discretion" the jury had "in determining the amount of its verdict." Lakota Girl Scout Council, 519 F.2d at 643.

Green Bay's challenge to the $33,681 in interest damages fails as well. As a defrauded party, BBSerCo was entitled to recover any "actual pecuniary loss sustained as a direct result of the wrong." Lamasters v. Springer, 99 N.W.2d 300, 304 (Iowa 1959). As stated above, BBSerCo had pledged the unpaid processing fees to its bank for payment of outstanding loan obligations. Green Bay knew that. As a direct result of Green Bay's failure to pay the $202,560 in processing fees, BBSerCo incurred an additional $33,681 in interest on its loan obligations, and was therefore entitled to recover those consequential costs. Cf. Metro. Transfer Station, Inc. v. Design Structures, Inc., 328 N.W.2d 532, 536 (Iowa Ct. App. 1982) ("[N]ondefaulting party may recover consequential costs, including interest payments to third persons which are reasonably foreseeable and proximately caused by the defaulting party's breach").

Finally, Green Bay challenges the jury's award of $100,000 in punitive damages. Green Bay's sole contention with respect to punitive damages is that such damages are unavailable for a breach of contract action unaccompanied by an intentional tort. See Pogge v. Fullerton Lumber Co., 277 N.W.2d 916, 920 (Iowa 1979). Green Bay argues BBSerCo's fraud claim was invalid, so the punitive damage award must be reversed. Since we reject Green Bay's challenge to the fraud claim, this sole challenge to the punitive damage award necessarily fails as well.

The judgment of the district court is affirmed in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.