ROY E. STELLER v. FRED A. THOMAS.[1]

December 29, 1950.

No. 35,181.

[1]Reported in 45 N. W. (2d) 537.

*Perry R. Moore, Robert W. Dygert, James L. Hetland, Jr., Stinchfield, Mackall, Crounse & Moore,* and *O'Neill J. Grathwol,* for appellant.

*Jay W. Smith,* for respondent.

CHRISTIANSON, JUSTICE.

This appeal arises out of an equitable action on a written contract for the sale of standing timber to be severed by the purchaser. Because of numerous alleged breaches of the contract, plaintiff, the vendor, sought to have the contract cancelled and requested further relief by way of injunction, damages, and an accounting. Pending decision on plaintiff's motion for an order to show cause why a temporary injunction should not issue, the court issued an order temporarily restraining defendant from cutting or removing any more timber or lumber from plaintiff's land. By agreement of the parties, hearing on the order to show cause was waived, and the temporary restraining order was continued in force during the pendency of this action.[2]

Defendant answered denying all alleged breaches of the contract and alleged a counterclaim for conversion of certain lumber and cut timber remaining on plaintiff's land which defendant claims plaintiff took possession of and converted to his own use after wrongfully obtaining the temporary restraining order. Defendant

[2]See, M. S. A. 585.03.

admitted as a setoff to his counterclaim that there was due plaintiff $2,685, representing the sale price for timber on 45 acres of plaintiff's timberland which had been cut over.

The trial court made findings of fact and conclusions of law in favor of defendant on the complaint and ordered judgment for defendant on his counterclaim in the net amount of $7,814.92. From the judgment entered pursuant thereto, plaintiff appeals. He assigns as error the denial of his motions for amended findings and conclusions and for judgment in his favor or, in the alternative, for a new trial.

On the view we take of this case, it is unnecessary to consider plaintiff's numerous assignments of error relating to improper findings of fact by the lower court. For all purposes material to our decision here, the facts may be assumed to be as follows:

Plaintiff is the owner of a farm in Hennepin county, Minnesota, intersected at one place by federal highway No. 7, which runs generally east and west. Prior to the transaction here involved the farm included about 88 acres of large standing hardwood timber north of highway No. 7 and about four acres of standing timber south of the highway.

Sometime in February 1947, while plaintiff was out of the state, his farm manager, Edgar Luedtke, and defendant entered into an oral agreement for the sale of the above-described timber. Defendant agreed to pay $60 an acre for the 88 acres north of the road and $225 for the four-acre tract south of the road, a total of $5,505.

Luedtke testified that it was orally agreed that defendant could start operating any place he wanted to, "but [to] clean up as he went along, pile the wood and burn the brush, and after he had approximately four or five acres cleared up and paid for, then he should go further and take another four or five acres or whatever he wanted in a small quantity." On cross-examination under the statute, defendant testified that "it was merely said that you [defendant] would have to take all the trees down and the brush would have to be burned," and that he was never told by plaintiff that he

wanted the brush burned as he went along. However, he admitted that the object of getting the timber off the land was to "use" the land and that the land could not be used with the brush on it.

Pursuant to the *oral* agreement[3] with Luedtke, defendant started cutting operations in February 1947, first upon the four-acre tract south of the highway. He took approximately 5,000 board feet from this tract, left pole wood on the tract, and did not burn the brush. Luedtke asked defendant to clean up this tract at the same time as the logs therefrom were being hauled away, because the only access to the four-acre tract was across plaintiff's alfalfa field, which could not be crossed after the frost left the ground. Defendant never completed clearing the four-acre tract and the brush still remains there. Plaintiff testified that he returned from his trip out of the state on March 12, 1947, and found the four-acre tract a "terrific mess," the trees were down, some of them trimmed and some not trimmed, and the brush was neither piled nor burned. At that time, defendant had started to clear another section in a 41-acre tract north of the highway and had cut two strips in order to put his sawmill on that location. Plaintiff testified that he then told defendant he wanted to get the four-acre tract cleaned up first so he could use it for a field and that before any lumber was removed he wanted to get together on how it was to be paid for. After plaintiff had expressed to defendant his disappointment over the progress that had been made, it was mutually agreed that the work was to be completed by the spring of 1948.[4] Plaintiff testified

---

[3]This court has held that an agreement for the purchase of standing timber is a contract for an interest in lands and must be in writing. Kileen v. Kennedy, 90 Minn. 414, 97 N. W. 126; La Plant v. Loveland, 142 Minn. 89, 170 N. W. 920. But see, 1 Williston, Sales (Rev. ed.) § 62; definition of "Goods" in uniform sales act, § 512.76(1); 34 Am. Jur., Logs and Timber, § 12; 54 C. J. S., Logs and Logging, § 11; 38 C. J., Logs and Logging, § 27; cf. Wilson, v. Fuller, 58 Minn. 149, 59 N. W. 988; Am. L. Inst., Uniform Commercial Code (May 1949 Draft) § 2-108.

[4]An oral contract for the sale of standing timber to be severed from the land by the vendee has been construed to be a mere license to enter and cut timber, which may be revoked at any time, but such trees as are

on cross-examination that the agreement was "that he [defendant] was to clear it, a certain amount of land at a time, take the lumber off of it, and clean it up and then go to another piece."

Defendant continued his operations until sometime in the spring of 1947. He had then cut down trees from six to eight acres north of the highway and a few of the large trees in other parts of the woods. He had secured in all from 10,000 to 12,000 board feet of lumber up to that time, but he did not clean up and pile the wood and burn the brush "as he went along." On July 30, 1947, plaintiff's attorney mailed a communication, plaintiff's exhibit G, to defendant. In that letter, plaintiff proposed to continue the agreement if defendant would pay him $690 before any of the cut lumber was moved. That sum, plus $310 credited to defendant for certain grading work done for plaintiff, would make an initial down payment of $1,000. This down payment was to be completed before August 1, 1947, and the balance was to be paid in monthly installments of $200 each commencing September 1, 1947. Exhibit G reads in part as follows:

"It is understood that when you cut the trees you intend to use for lumber, you are to clear the small trees and brush and burn all brush as you go along at the same time, * * *.

"It is also expressly understood that the clearing of the land shall be done to Mr. Steller's Satisfaction and without too great a delay, and that the entire job shall be completed by September 1, 1949.

"It is also to be understood that no lumber shall be moved until you accept the above terms."

cut down before revocation of the license become personalty and belong to the licensee. "* * * when the timber is severed the contract becomes an executed one for the sale of personal property, with all the incidents of any other contract of sale of chattels." Wilson v. Fuller, 58 Minn. 149, 150, 59 N. W. 988, 989; cf. Reid v. Kier, 175 Or. 192, 152 P. (2d) 417, where the Oregon court held a written sales contract was not within sales act because the buyer was not obligated thereby to sever timber within any particular period of time.

Defendant made no response in writing to exhibit G and denied that he had ever agreed to the contents thereof. However, he admitted that he received this letter; that operations were resumed in the fall of 1947, "in October 1947" or "around the 16th of November"; that he made sales and removed lumber from the land and permitted some of the buyers to remove lumber themselves after the 16th of November; and that he paid the sum of $500 to plaintiff on November 22, 1947. Defendant's objection to exhibit G as incompetent and immaterial and an attempt to vary the terms of the written contract between the parties was overruled by the trial court, and exhibit G was received in evidence.

As a result of the differences between the parties and plaintiff's dissatisfaction with defendant's operations up to that time, the written contract[5] involved here was drawn up by plaintiff's attorney and entered into on November 24, 1947.

[5]The provisions of the contract insofar as they are material here read as follows:

"Whereas, it is the desire of the parties hereto to adjust any differences between themselves and to enter into this Memorandum of Agreement for the purpose of completing the agreement for the cutting of said timber and to sawing thereof into lumber, and the selling of said lumber, and

"Whereas, the State Bank of Mound has entered into an agreement with the second party for the purpose of financing the operations of the second party up to a sum agreed upon by said bank, and said second party.

"Now, Therefore, in consideration of the mutual covenants and agreements of the parties hereto, it is hereby understood and agreed as follows:

"1. That second party will cut said timber, saw as much as possible thereof into lumber and the balance into pole, slab and cord wood and pile and burn all brush, all to the satisfaction of first party, and to complete all of said work on or before September 1, 1949.

"2. That second party will sell the said lumber, after cut, as promptly as possible and at as high a price as shall be available therefor, and shall complete said selling on or before September 1, 1949.

\* \* \* \* \*

"6. That for each 1,000 feet of lumber sold there shall be paid out of funds received therefor, twenty per cent (20%) thereof to Roy E. Steller to apply on the balance due to him as above set forth; Thirty-five Dollars ($35.00) to the State Bank of Mound, to apply on any funds advanced by

About the time the contract was signed, defendant informed plaintiff that he had made arrangements with the State Bank of Mound "to finance his operations," and that "he didn't have enough money to meet his payroll at the time this agreement was signed; except by borrowing from one source or another." Plaintiff testified that defendant told him that "That was the method * * * he was going to use to finance." However, within two or three weeks after the contract was signed, plaintiff "learned" that the State Bank of Mound had not made its contemplated agreement with defendant, for the reason that the board of directors of the bank did not approve it. Nevertheless, plaintiff and defendant considered the written contract binding as between them. Plaintiff testified that defendant agreed[6] to pay him, instead of the State Bank of Mound,[7] every Saturday for the amount of lumber that defendant took off the land under the written contract. Defendant in his testimony admitted his obligation to pay plaintiff 20 percent of the proceeds of the lumber sold. The record discloses that plaintiff received a total sum of $470.70 from the cash proceeds of lumber sales totaling $3,855.93, which defendant admitted he had collected from Novem-

said bank to the second party, and the balance thereof to the second party.

"7. The second party hereby gives and grants to the first party a chattel mortgage on all lumber, slab wood, pole wood, or cord wood still remaining on first party's land, and second party, upon request of the first party, shall execute a proper promissory note and chattel mortgage as security for the payment thereof covering all of said lumber and wood remaining on first party's land when such request shall be made."

[6]Evidence of a subsequent oral modification of a written contract is not barred by the parol evidence rule. See, Trovatten v. Minea, 213 Minn. 544, 7 N. W. (2d) 390, 144 A. L. R. 1263; Benedict v. Pfunder, 183 Minn. 396, 237 N. W. 2; 2 Dunnell, Dig. & Supp. §§ 1774, 3392, 3405.

[7]Paragraph 3 of the contract provided that defendant was to keep a strict account of all lumber sold and to account to the bank every two weeks for the amount of lumber cut, the amount sold, the sale price and the amount of money received therefor. Paragraph 5 provided that all remittances received from sale of lumber were to be payable to plaintiff, the bank, and defendant; and after endorsement delivered to the bank.

ber 24, 1947, to April 16, 1948, from sales made during that period. Twenty percent of $3,855.93 equals $771.18.

At the trial, plaintiff admitted liability for the reasonable value of the cut timber and lumber on his land. Although he denied liability in conversion, he conceded that defendant should be allowed the value thereof, apparently on the basis of unjust enrichment. Defendant likewise admitted that plaintiff should be allowed a credit for the timber he had cut. However, he denied any liability for the clearing of the cutover land or for piling and burning the brush.

From its own findings of fact (which it seems unnecessary to set forth here), the lower court made conclusions of law to the effect that (1) the temporary restraining order had been improvidently issued; (2) the prayer of plaintiff for an injunction should be denied; (3) by obtaining the temporary restraining order and excluding defendant from the premises, plaintiff "breached the contract and made it impossible for defendant to perform the same"; (4) "on April 16, 1948, plaintiff by obtaining the restraining order and taking possession of the lumber, slabwood, polewood, and cut, but not sawed, logs *to the exclusion of all rights of the defendant therein,* converted said woods products to his own use [italics supplied]"; and (5) the reasonable market value thereof on April 16, 1948, was $8,319.20, and the amount due from defendant to plaintiff for lumber cut was $1,401.97, entitling defendant to judgment against plaintiff in the sum of $6,917.23 with interest at six percent from April 16, 1948, and costs.

■ At the outset, it should be recognized that one of the primary purposes of the parties in entering into the timbering agreement was, as admitted by defendant, to have the land cleared so that it could be used for pasture or agricultural purposes. Defendant's performance of the obligations set forth in paragraph 1 of the written contract was the substantial part of the exchange made for the timber furnished defendant at the price of $60 per acre.[8] Paragraph 1 of the contract provides:

---

[8]Restatement, Contracts, § 266.

"1. That second party [defendant] will cut said timber, saw as much as possible thereof into lumber and the balance into pole, slab and cord wood and *pile and burn all brush, all to the satisfaction of first party,*[9] *and to complete all of said work on or before September 1, 1949.*" (Italics supplied.)

Defendant concedes that he burned only "an acre or two" of the brush. However, he contends that paragraph 1 should be construed to mean that the contract was to have been completed on September 1, 1949, to the satisfaction of plaintiff, and that if defendant failed to clean up the brush by that time plaintiff would have had a cause of action against him. To so construe paragraph 1 of the contract would, in our opinion, place too narrow and technical a construction upon it. Such an interpretation would render the "satisfaction" clause therein practically meaningless, because it would then mean that no matter how slowly the cutting of the trees progressed or how carelessly any of the work was done plaintiff would be without remedy to get his land cleared until September 1, 1949. We are satisfied that such was never the intent of the parties. It must be assumed, particularly in the light of the nature, subject, and purpose of the contract, that the words "all to the satisfaction of first party" were intended by the parties for a definite purpose and were meant to be given a special meaning appropriate to this contract. In referring to the meaning and application of a "satisfaction" clause in a contract, Mr. Justice Mitchell in Magee v. Scott & Holston Lbr. Co. 78 Minn. 11, 16, 80 N. W. 781, 782, said:

"The whole question is one of construction of the contract and the intention of the parties. This is not to be determined exclusively

---

[9]Restatement, Contracts, § 265, provides: "A promise in terms conditional on the promisor's satisfaction with an agreed exchange, gives rise to *no duty of immediate performance until such satisfaction;* but where it is doubtful whether words mean that a promise is conditional on the promisor's personal satisfaction with an agreed exchange, or on the sufficiency of that exchange to satisfy a reasonable man in the promisor's position, the latter interpretation is adopted." (Italics supplied.) See, also, 3 Williston, Contracts (Rev. ed.) § 675A.

from its mere language, but in determining what the parties meant by that language, or in what sense they used it, it must be construed in the light of the nature, subject, and purpose of the contract. And where courts have construed such a provision as meaning, not that the absolute right of decision was completely reserved to one of the parties, but that he should found his decision upon just and adequate grounds, they have based this construction upon the ground, not that the parties could not so contract, but that, in view of all the facts, they could not have intended to do so, but in incorporating such a provision into their contract they must have understood and adopted it in the latter sense."

Exhibit G and the testimony relative to the prior oral agreements between the parties are highly significant in construing the satisfaction clause, because that evidence shows what plaintiff had been dissatisfied with in the past. By the same token, that evidence shows what defendant must have understood plaintiff wanted in the way of satisfaction. It shows that plaintiff made repeated attempts orally and at least one attempt in writing to get defendant to agree to clear the land as he went along. In the light of this evidence, it appears contrary to all logic and common sense to contend that in drawing up a contract calling for "satisfaction" on plaintiff's part that he no longer cared how or when the land was cleared so long as the work was completed on or before September 1, 1949. Likewise, this evidence supports plaintiff's construction of the words "to complete all of said work on or before September 1, 1949," as meaning only that all the work covering the entire 92 acres of timberland was to be completed by defendant on or before that date. Exhibit G was competent as evidence not of an existing agreement between the parties, but to explain what plaintiff meant by the "satisfaction" clause as well as by the "completion" clause of the contract. We consider it permissible to resort to this letter only because of the ambiguity created when the two clauses are read

together.[10] The language used by the parties and the inferences properly to be drawn from the extrinsic evidence conclusively show that the parties contemplated by their contract that reasonable progress should be made in all the work specified in paragraph 1 of the contract and that the clearing of the land should be carried out in a manner reasonably satisfactory to plaintiff.[11] This was an express condition as well as an express promise. Restatement, Contracts, § 261.

There can be no question that defendant's failure to pile and burn the brush was highly unsatisfactory to plaintiff and that his dissatisfaction was that of a reasonable man in his position. Defendant himself admitted his failure to burn the brush after he had been asked to do so by plaintiff in December 1947, later by Luedtke in February 1948, and again by plaintiff in March or April 1948. Defendant did nothing about removing any of the brush thereafter, and the land remained in an unusable condition. Defendant gave as a reason for his failure to pile and burn the brush that he was prevented from doing so by the temporary restraining order served on him on April 17, 1948. However, the restraining order did not exclude defendant or his employes from plaintiff's land, nor did it prevent defendant from piling and burning the brush thereon. Ostensibly, it restrained defendant only "from cutting or removing timber or lumber" from plaintiff's land for a period of only four days. See, Sullivan v. Weibeler, 37 Minn. 10, 32 N. W. 787. Defendant's failure and refusal from December 1947 to April 16, 1948, to pile and burn the brush constituted not only a breach of an express condition, but also a breach of a contractual duty imposed upon defendant by his promise to do so. See, Restatement,

[10]See, Wilmot v. Minneapolis Auto. Trade Assn. 169 Minn. 140, 210 N. W. 861; Spielman v. Albinson, 183 Minn. 282, 236 N. W. 319; O'Connell v. Ward, 130 Minn. 443, 153 N. W. 865.

[11]Cf. Homer Laughlin Engineers Corp. v. J. W. Leavitt & Co. 116 Cal. App. 197, 200, 2 P. (2d) 511, 512, and Waite v. Shoemaker & Co. 50 Mont. 264, 146 P. 736, for interpretation of satisfaction clauses supporting this conclusion.

Contracts, § 257. In and of itself, this constituted a material breach of the contract.[12] See, Restatement, Contracts, § 275. Moreover, defendant had breached his oral promise to pay plaintiff 20 percent of the proceeds from the sale of the lumber and timber products. Restatement, Contracts, § 274. Together they clearly constituted a total breach of the contract. Restatement, Contracts, §§ 317, 313 (1).

■ Defendant erroneously sought, and the trial court granted him, *damages* on the theory of plaintiff's conversion on April 16, 1948, of the cut timber and lumber then remaining upon his land because of the issuance of the temporary restraining order. Plaintiff made no attack upon defendant's pleadings,[13] and the trial court adopted defendant's erroneous theory of damages for conversion as set forth in his counterclaim. From the trial court's memorandum[14] accompanying its order denying plaintiff's alternative motion for amended findings and conclusions or a new trial, it appears that the trial court based its conclusion of plaintiff's conversion on April 16, 1948, and its award of damages to defendant therefor upon its finding that the temporary restraining order obtained on that date was improvidently issued. We find it unnecessary to review the trial court's finding in this respect, because, even if we assume, without deciding, that the restraining order was improvidently issued, that fact would not support a cause of action for conversion or entitle defendant to recover damages in this case. See, Midland Loan Finance Co. v. Temple Garage Co. Inc. 206 Minn. 434, 288 N. W. 853. Furthermore, assuming that the wording of the restraining order went too far in restraining the

[12]See, Magee v. Scott & Holston Lbr. Co. 78 Minn. 11, 80 N. W. 781; Frary v. American Rubber Co. 52 Minn. 264, 53 N. W. 1156, 18 L. R. A. 644; O'Dea v. City of Winona, 41 Minn. 424, 43 N. W. 97; 2 Dunnell, Dig. & Supp. § 1783; 1 Minn. L. Rev. 88; 14 Minn. L. Rev. 87.

[13]See, Blue Earth Valley Tel. Co. v. Commonwealth Utilities Co. 140 Minn. 198, 167 N. W. 554; M. S. A. 544.05.

[14]See, Marthaler Mach. & Eng. Co. v. Meyers, 173 Minn. 606, 218 N. W. 127; Johnson v. Johnson, 92 Minn. 167, 99 N. W. 803.

removal of the lumber and timber already cut,[15] the error, if any, was acquiesced in by defendant, and we need not inquire into the propriety thereof here. Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619.

It is well settled that *damages* caused by an injunction improvidently granted cannot be recovered by a defendant from the injunction plaintiff independently of the bond or undertaking unless the injunction suit was maliciously instituted without probable cause.[16]

---

[15]Ordinarily, the removal of timber already cut will not be enjoined in the absence of an allegation of insolvency of defendant. 32 C. J., Injunctions, § 192; 43 C. J. S., Injunctions, § 66b. Cf. Northern Lbr. Co. v. Lundgren, 182 Minn. 89, 233 N. W. 593, where judgments enjoining the defendant from entering on the land or cutting or removing any timber therefrom were sustained because the permit was construed as being conditioned on payment. See, also, A. C. Alexander Lbr. Co. v. Bagley, 184 Ga. 352, 191 S. E. 446. Since plaintiff here in his argument and brief has not discussed the refusal of the trial court to grant him a permanent injunction, his assignment of error on this point is deemed to have been waived. 1 Dunnell, Dig. & Supp. § 366.

[16]Hayden v. Keith, 32 Minn. 277, 20 N. W. 195. See, Pelkey v. National Surety Co. 143 Minn. 176, 173 N. W. 435; Midland Loan Finance Co. v. Temple Garage Co. Inc. 206 Minn. 434, 436, 288 N. W. 853, 854; 3 Dunnell, Dig. & Supp. § 4499; 1 Spelling, Injunctions and Other Extraordinary Remedies (2 ed.) § 964, p. 817; Annotation, 45 A. L. R. 1517, 1518; 28 Am. Jur., Injunctions, § 335; 43 C. J. S., Injunctions, § 281. In Hayden v. Keith, *supra*, this court held that where there is no evidence tending to show malice or lack of probable cause the bond is the only security of the defendant in an injunction suit. The court stated (32 Minn. 278, 20 N. W. 195): "Gen. St. 1878, c. 66, § 203, is a transcript of section 222, N. Y. Code, which was substituted for rule 31 of the court of chancery in that state, from which rule 7, Minnesota Territorial District court, (equity side,) appears to have been copied. 1 Minn. 461. *Prior to the adoption of that rule the defendant was remediless for any damages suffered by reason of the issuance of an injunction, unless maliciously caused to be issued.* The sole remedy is, therefore, that which is furnished by the statute upon the bond." (Italics supplied.) Cf. Greenwood County v. Duke Power Co. (4 Cir.) 107 F. (2d) 484, 131 A. L. R. 870; 24 Minn. L. Rev. 994.

288

Defendant cites no legal authority to support his contention that plaintiff converted the lumber and timber products to his own use and benefit on April 16, 1948, and we find nothing in the record which would support the trial court's finding of conversion.

"* * * 'To constitute a conversion of goods, there must be some repudiation of the owner's right, or some exercise of dominion over them inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel.' " Merz v. Croxen, 102 Minn. 69, 72, 112 N. W. 890, 891.

See, also, Borg & Powers Furniture Co. v. Reiling, 213 Minn. 539, 7 N. W. (2d) 310; Brandenburg v. N. W. Jobbers Credit Bureau, 128 Minn. 411, 151 N. W. 134, L. R. A. 1915D, 474; Dow-Arneson Co. v. City of St. Paul, 191 Minn. 28, 253 N. W. 6. Admittedly, plaintiff here was the owner in possession of said land during all the time in question. Defendant neither pleaded nor offered to prove that the lumber and timber products became worthless or depreciated in value during the period the restraining order was in effect.[17] In fact, defendant testified that the lumber was of greater value at the time of trial than it was in April 1948, because it was dry. Furthermore, defendant made no showing that he was excluded from the land in question or that plaintiff deprived him of any right of control over said timber products except by reason of the judicial restraint imposed upon him by the temporary restraining order, which he did not oppose.[18] No evidence of demand or refusal of possession of the timber products was even offered.[19] Moreover, it affirmatively appears that defendant at no time tendered to plaintiff the balance of the sale price for the total of approx-

[17]Cf. Interstate Nat. Bank v. McCormick, 67 Mont. 80, 214 P. 949, 34 A. L. R. 721.

[18]Tousley v. Board of Education, 39 Minn. 419, 40 N. W. 509; Peck v. McLean, 36 Minn. 228, 30 N. W. 759; cf. McDonald v. Bayha, 93 Minn. 139, 100 N. W. 679.

[19]See, Lucas v. Case, 150 Minn. 45, 184 N. W. 837; Boxell v. Robinson, 82 Minn. 26, 84 N. W. 635; 53 Am. Jur., Trover and Conversion, §§ 88, 89; 65 C. J., Trover and Conversion, § 56.

imately 45 acres of timber which defendant admitted both in his verified answer and at the trial was due plaintiff on April 16, 1948, for the timber that had been cut therefrom.[20] The trial court's finding that plaintiff had had possession of the land and the lumber and of the timber products in question since April 16, 1948, and that plaintiff testified at the trial that he claimed all of said lumber and wood as belonging to himself does not support its conclusion of conversion.[21] Moreover, the finding that plaintiff "sold some of it and used small portions of it for his own use" does not support this conclusion, because it appears without contradiction that the small amount of timber sold and used by plaintiff was with defendant's express consent.

The trial court's conclusion that plaintiff converted defendant's lumber and breached the contract finds no support in the record. Its finding and conclusion that the temporary restraining order was improvidently issued, even if justified, is entirely irrelevant to a proper determination of the merits of this case and should be stricken.

■ The judgment appealed from cannot be sustained on the record before us under any theory. At the trial, plaintiff limited his claim for damages to the contract price for the 72 acres he claimed defendant cut over and the cost of clearing the land and piling and burning the brush on these 72 acres. He made no claim for the acres which defendant had not touched. Defendant did not dispute plaintiff's claim that he had breached the oral agreement to pay plaintiff 20 percent of the proceeds received from the sale of the lumber. In fact, it appears that it was defendant's own testimony that established the breach thereof and confirmed the existence of the subsequent oral agreement. Defendant did not seek damages on the ground that plaintiff breached the contract, but counterclaimed only for the value of the cut timber and

[20]See, chattel mortgage provisions contained in paragraph 7 of contract, footnote 4, *supra,* and 53 Am. Jur., Trover and Conversion, §§ 86, 87; 65 C. J., Trover and Conversion, § 106.

[21]See, 53 Am. Jur., Trover and Conversion, § 25, and cases cited.

lumber located on plaintiff's land on April 16, 1948. He did not seek possession of said lumber and cut timber.[22] He admitted liability to plaintiff for the contract price of the standing timber he had cut. Defendant's pleadings and proof, as well as plaintiff's, were based on the fact that the contract was at an end insofar as any further performance thereunder by either party. See, Restatement, Contracts, § 313(1).

In its findings of fact the trial court limited defendant's liability for the timber cut north of the highway to $2,460, representing the contract price for 41 acres. The evidence is undisputed that defendant cut over more than 41 acres of land north of the highway. He himself admitted that he had cut timber in approximately 13 additional acres north of the highway in addition to the 41 acres upon which the trial court's finding is based. Plaintiff's testimony showed that a total of 68 acres was invaded north of the highway, and this testimony was never directly contradicted by defendant. The trial court's finding that "It was stipulated and agreed by the parties * * * that on April 16th, 1948, there was due the plaintiff * * *; for the forty-one acres cut on the north side of Highway No. 7, at $60.00 per acre, the sum of $2,460.00," cannot be sustained. The record clearly shows that plaintiff at all times claimed damages not only for the 41 acres for which defendant admitted liability, but also for the rest of the timber defendant had cut in addition to the 41 acres. There is nothing in the record to indicate that plaintiff ever limited his claim in this respect by stipulation or otherwise.

The trial court's findings in respect to the value of the cut timber and lumber on plaintiff's land on April 16, 1948, are not sustained by the evidence. Without going into the details of the evidence on this point, it is sufficient to say that the lower court expressly based its finding as to value ($3,569.20) of the timber and lumber, consisting of oak, maple, ash and elm, basswood, red oak, and ash and elm mixed, upon the testimony of defend-

---

[22]See, Alexander v. Bauer, 94 Minn. 174, 102 N. W. 387; Pryor v. International Lbr. Co. 157 Minn. 157, 195 N. W. 772.

ant's witness Theodore Anderson of Remer, Minnesota. Anderson was defendant's foreman on the job. He testified that there were 58,685 board feet of cut timber and lumber remaining on plaintiff's land on April 16, 1948. He admitted that he was familiar with the price of lumber "where I come from [Remer]," but "not here [in Minneapolis] though." Over plaintiff's proper objection, he was permitted to testify to the market value on April 16, 1948, of the various kinds of lumber generally. However, he did not purport to give testimony as to the market value of the lumber in question according to its different grades. The record reveals that twice in his testimony he stated that he did not know the value of the lumber in "the Minneapolis area." Moreover, it appears that the trial court's findings of value in a number of instances were substantially higher than the price defendant received from the sales thereof in the Minneapolis area. See, 20 Am. Jur., Evidence, § 372. Likewise, the trial court's finding as to the value of the slab wood at $750 and pole wood at $2,000 rests entirely upon speculation and conjecture as to quantity, grade, and value. The same situation exists with reference to the saw logs where the value allowed of $2,000 was $810 more than was alleged in defendant's counterclaim, which never was amended. None of the trial court's findings as to the value of the lumber and cut timber can stand, in view of the speculative nature of the testimony upon which they are based.

Because of the many errors of law and fact referred to, the judgment of the trial court is reversed and a new trial granted.

Judgment reversed.