EMPLOYEE BENEFITS PLUS,
INC., Plaintiff–Appellee,

v.

DES MOINES GENERAL HOSPITAL,
Defendant–Appellant.

No. 94–361.

Court of Appeals of Iowa.

May 30, 1995.

Eugene E. Olson and Douglas A. Fulton of Connolly, O'Malley, Lillis, Hansen & Olson, Des Moines, for appellant.

Frank Murray Smith of the Frank Murray Smith Law Office, Des Moines, for appellee.

Heard by HABHAB, P.J., and CADY and HUITINK, JJ., but decided en banc.

CADY, Judge.

Des Moines General Hospital (hospital) appeals the trial court order finding it entered into and breached an oral contract with Employee Benefits Plus (EBP). Under the alleged contract EBP was to provide employee benefit seminars and statements to the hospital employees. The court found the hospital breached the agreement or prevented EBP from completing the necessary conditions precedent to the agreement. It awarded EBP $38,000 in damages. The main issue on appeal is the sufficiency of the evidence to support the court's decree. We affirm.

EBP is a corporation formed from the partnership between two insurance agents, Stephen Bruce and Rod Shipley. EBP offers employers a review of their employee benefit packages, and presentations to employees in which the benefit packages are explained.

In the fall of 1990, Loren Slade, the chief operating officer of the hospital expressed an interest in hiring EBP to conduct benefit seminars for the hospital's employees. At this time, EBP was a fledgling business venture. It had not yet performed its services for an employer.

In October 1990, Bruce, Shipley, Slade and Alex Oponski, the hospital's acting director or director of human services, met to discuss the hospital's use of EBP's services. EBP discussed several service and price options with the hospital, including the production of benefit statements and employee presentations at the cost of $28.50 per employee. Alternatively, EBP offered to charge $5 per employee if the hospital agreed to allow it to sell life insurance during the seminars. Oponski and Slade expressed interest in pursuing the latter option.

EBP's right to make the presentations was subject to three conditions. First, the hospital had to approve of the life insurance company and product being offered to its employees. Second, the "management committee" had to approve EBP's employee presentation. Third, Slade had to approve the employee's individualized benefit statements. The benefit statements required the hospital to divulge specific employee information regarding wages and current benefits. The parties apparently discussed memorializing the agreement in writing, but a contract was never executed.

EBP submitted a written contract in October 1990 and a bill in December. Shipley testified he was told on two occasions to come to the hospital and pick up the signed contract. The contract, however, was never available. In December 1990, or January 1991, EBP raised its prices to $10 per employee. Slade, however, insisted EBP adhere to the original $5 price.

EBP subsequently provided the hospital with information regarding potential life insurance companies. The hospital never expressly ratified or rejected any particular company. EBP understood that Slade had chosen the Reliance Standard Insurance

Company. Meanwhile, with the partial employee information provided by the hospital, and an independent investigation, EBP developed draft employee benefit statements.

On March 14, 1991, EBP presented a sample benefits seminar to a committee at the hospital. Bruce understood this committee to be the "management committee" whose ratification was required for it to obtain the contract with the hospital. It was actually the marketing committee, and according to Slade lacked power to ratify the potential contract with EBP. The response from this marketing committee was apparently favorable. Later that day, the hospital provided EBP with more specific employee data, including social security numbers, job titles, and pay rates.

Also sometime in March 1991, EBP and Oponski discussed scheduling the benefit presentations for early May and the parties prepared a payroll-stuffer to notify the employees of the upcoming presentations. The hospital delayed the presentations allegedly because it was unhappy with the individualized statements being prepared by EBP. EBP claimed the hospital had yet to present it with sufficient information to detail the statements as Slade desired. Upon EBP's request for payment, Slade agreed to tender one-half of the five dollar fee for 756 employees or $1890. Slade testified he tendered the payment despite his understanding there was not yet a contract between the parties.

On June 27, 1991, EBP sent the hospital a substantially complete benefits statement and a proposed contract. EBP also requested the second installment of the proposed contract price. The hospital did not respond. On July 15, 1991, EBP sent a letter to Roy Wright, the hospital's chief executive officer, requesting that a date be set for their presentations.

On July 23, 1991, Oponski responded to EBP, indicating the hospital wanted to continue working on benefit statements, but the current statements were unacceptable. Oponski also asked whether EBP would like to continue working on the statements without any guarantee it would be the company to make the presentations. EBP did not respond to this letter.

In January 1993, EBP brought suit against the hospital for breach of contract. The matter proceeded to a bench trial.

The district court concluded EBP and the hospital had entered into a binding oral agreement. It found EBP had either satisfied the conditions precedent or was prevented from satisfying them because of the hospital's actions. It awarded EBP $38,000 in damages based upon income it would have received by selling the employees life insurance. It based its sales percentage upon the amount of life insurance sold by EBP to a smaller hospital during similar benefits seminars. The hospital appeals. It asserts the court erred in finding an oral agreement existed between the parties, finding it breached any agreement, and awarding damage that were unforeseeable, unduly speculative, and excessive.

## I. Scope of Review

 Whether an oral contract existed and whether it was breached are ordinarily questions for the trier of fact. *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 165 (Iowa App.1993). The district court's findings of fact are, therefore, binding on appeal if they are supported by substantial evidence. Iowa R.App. 14(f)(1). We review for correction of errors at law. Iowa R.App. 4; *Mosebach v. Blythe*, 282 N.W.2d 755, 759 (Iowa App.1979).

## II. Oral Contract

The hospital asserts there was insufficient evidence to support the district court's finding that an oral contract existed between the hospital and EBP. They maintain the parties did not intend to be bound until the three conditions were fulfilled and the agreement was reduced to writing. Upon our review, we conclude the negotiations and course of dealings between the parties support the district court's finding that the parties intended to enter an oral contract.

 Although both parties testified they contemplated a written contract this is insufficient to defeat EBP's assertion the parties negotiations ripened into an oral contract. An oral contract may exist even though the

**154**

parties intended to reduce it to writing at a later date. *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977); Restatement (Second) of Contracts § 26 (1979). If the oral agreement is complete as to its terms and has been finally agreed to, it will generally be enforceable. *Elkader Cooperative Co. v. Matt,* 204 N.W.2d 873, 875 (Iowa 1973). Under these circumstances, the writing is merely an expression of a previously completed contract. *Id.*

■ Whether the parties intended the oral agreement to be binding prior to the execution of a written document is the decisive issue. *Id.;* 17A Am.Jur.2d *Contracts* § 38 (1991). Factors to be considered in making this determination include whether: the contract is of a class usually found to be in writing; it is of a type needing a formal writing for its full expression; it has few or many details; the amount is large or small, the contract is common or unusual; all the details have been agreed upon or some remain unresolved; and the negotiations show a writing was discussed or contemplated. *Severson,* 250 N.W.2d at 421.

■ The contract in this case is not complicated and there is no dispute as to its terms. EBP agreed to provide individualized benefit statements and conduct education seminars in exchange for payment of $5 per employee and the opportunity to sell life insurance to employee groups. EBP's right to make the presentations was conditioned on the hospital approval of the insurance company, management committee approval of EBP's presentation, and Slade's approval of the benefit statements.

Furthermore, the parties adhered to the terms established in their initial meetings and took steps to carry them out. EBP gave a sample benefit's presentation, and dates were set for the actual presentations. The hospital supplied EBP with confidential employee information and paid EBP half of the agreed fee. Additionally, when EBP attempted to raise its prices, the hospital insisted on the original price term.

The payroll stuffer notifying the employees of the benefit seminar also supports an intent to contract. It was drafted by EBP and approved by the hospital. It stated, "We have contracted with Employee Benefits Plus to explain your benefits in detail."

Finally, the amount of the contract was relatively small, and this is not the type of contract required to be in writing. We, therefore, conclude there was substantial evidence to support the district court's finding that EBP and the hospital intended to form an oral contract.

### III. Conditions Precedent

The hospital asserts the district court erred in determining the contract was breached although certain conditions precedent to the contract were not satisfied. A review of the law regarding conditions precedent will facilitate our resolution of this issue.

■ Conditions precedent are those facts and events, occurring subsequent to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, and before the usual judicial remedies are available. *Khabbaz v. Swartz,* 319 N.W.2d 279, 283 (Iowa 1982). When a contract conditions one party's performance on the "satisfaction" of another, there are two standards which can be applied to determine satisfaction: the objective reasonable satisfaction standard and the subjective personal satisfaction standard. *Amfac Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 839 P.2d 10, 23 (1992); *Mattei v. Hopper,* 51 Cal.2d 119, 330 P.2d 625, 626–27 (1958). Absent express contractual language indicating which standard to apply, the objective reasonable satisfaction standard is applied when the contract involves commercial quality, operative fitness, or mechanical utility which knowledgeable persons are capable of judging; the subjective personal satisfaction standard is applied when the contract involves personal aesthetics, taste or fancy. *Id.; see also* 3A Arthur L. Corbin, *Corbin on Contracts,* §§ 645–646, at 86–87, 93–94 (1960). When the express language or nature of the contract do not make it clear that personal satisfaction is required, the law prefers the objective (reasonable person) standard. *Amfac Inc.,* 839 P.2d at 23; *Steller v. Thomas,*

232 Minn. 275, 45 N.W.2d 537, 542 n. 8 (1950).

■ Failure to perform a condition precedent, based on personal satisfaction or otherwise, generally vitiates the contract. *Bruggemeyer v. Bruggemeyer,* 258 N.W.2d 364, 366 (Iowa 1977). However, if one party to a contract prevents the other from performing a condition or fails to cooperate to allow the condition to be satisfied, the other party is excused from showing compliance with the condition. *See Sheer Const., Inc. v. Hodgman & Sons, Inc.,* 326 N.W.2d 328, 332 (Iowa 1982) (holding all contracts contain an implied term that the the the person for whom the work is contracted to be done will not obstruct, hinder, or delay the contractor); Restatement (Second) of Contracts § 245 (1979).

■ Both parties agree Slade's personal approval of the benefit statements was a condition precedent to the contract. The nature of the contract and multiplicity of factors to be considered in evaluating the benefit statements indicate a subjective satisfaction standard should be applied. *See Mattei,* 330 P.2d at 627. Applying this standard EBP clearly failed to meet the condition.

The district court, however, found EBP was excused from complying with this condition because the hospital had inhibited its ability to perform by withholding necessary employee information.

We conclude there was substantial evidence from which the court could find EBP proved it was unable to meet the personal satisfaction condition due to the hospital's bad faith. Shipley testified that after the May presentation was canceled he continued to revise the benefit statements with Joe Kownacki, the hospital's benefit specialist, and a new presentation date in August was tentatively established. On June 27, 1991, EBP also sent Slade a substantially complete benefits statement to review.

At this point however, communication between the hospital and EBP stopped. Kownacki canceled an appointment with Shipley and the hospital failed to return EBP's phone calls. It gave no indication that it was dis-satisfied with EBP's efforts to personalize the benefit statements and provided no further employee information. It did not respond to EBP until July 23, when it offered EBP the opportunity to develop the statements without a guarantee that it would be selected by the hospital to present the statements. There was no further communication between the parties until October 1991 when EBP called the hospital and was informed its services would be discontinued. At trial, Oponski testified a factor in the hospital's decision to terminate EBP's services was its decision to use an alternative benefit system which did not require benefits statements.

■ Additionally, there was substantial evidence that EBP could have met Slade's expectations but for the lack of cooperation from the hospital after June 21. Oponski testified that EBP was accommodating and the hospital had no complaints about their willingness to tailor the benefit statements to Slade's specifications. According to Shipley, the only obstacle to meeting Slade's requirements was further direction and information from the hospital. He indicated, he was able to make any necessary alterations in the computer program used to generate the benefit statements, and with the appropriate information he could address each of the problems Slade detailed at trial.

■ There was also substantial evidence to support the court's conclusion that the insurance and sample presentation requirements had been met or waived. In December 1990 and January 1991 EBP submitted information regarding insurance companies and their products to the hospital. The hospital never disapproved the insurance company or the product, and Bruce testified he believed Slade has chosen Reliance Standard Insurance Company. Moreover, the parties proceeded with the groundwork for their mutual performance. Employee information was exchanged, a sample benefits presentation was completed, and the actual benefits presentation was planned.

Similarly, the hospital did not indicate, until trial, EBP had failed to present a satisfactory sample benefits presentation. In March 1991 EBP gave a sample benefits presenta-

tion to a marketing committee. EBP understood they had given the presentation to the appropriate entity and it had gone well. The hospital gave no contrary indication. In fact, after the presentation the hospital provided EBP with additional confidential employee information and indicated the presentation was favorably received.

■ The hospital's assertion at trial that EBP failed to meet the insurance and presentation requirements was inconsistent with its conduct during the parties relationship. By continuing performance without informing EBP whether the conditions had been met the hospital impliedly waived the conditions. *See Forman v. Benson*, 112 Ill.App.3d 1070, 68 Ill.Dec. 629, 634, 446 N.E.2d 535, 540 (1983) (words or conduct of a party inconsistent with their intention to rely on the requirements of the contract may constitute waiver); *see also* E. Allan Farnsworth, *Farnsworth on Contracts*, § 8.5, at 375 (1990) (conduct such as continuing performance with knowledge that the condition has not occurred is sufficient to infer waiver of the condition); 17A Am.Jur.2d *Contracts* § 653 (1991).

## IV. Damages

The hospital asserts two primary errors in the trial court's determination of EBP's damages for lost profits. First, it claims EBP's losses were not reasonably within the hospital's contemplation. Second, it posits the evidence of future profits supplied by EBP was inadequate and speculative.

■ Generally, profits which would have been realized had the contract been performed are recoverable if their loss was within the contemplation of the defaulting party at the time the contract was made, and the profits can be proved with reasonable certainty. *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 797 (Iowa 1984); 22 Am.Jur.2d § 630 (1988). It is presumed that the lost profits were in the contemplation of the defaulting party if the profits would have arisen had the contract not been breached. *Id.*

■ Iowa also recognizes the new business rule which deems potential profits from a new commercial enterprise too speculative to be recoverable. *Harsha*, 346 N.W.2d at 797. The rationale underlying the rule is that there is no available data of past business from which anticipated profits could be established. *Id.* (quoting *City of Corning v. Iowa–Nebraska Light & Power Co.*, 225 Iowa 1380, 1389, 282 N.W. 791, 796 (1938). The rule, however, is not absolute. *G & H Soybean Oil v. Diamond Crystal Specialty Foods*, 796 F.Supp. 1214, 1216 (S.D.Iowa 1992). If factual data furnishing a basis for probable loss of profits is presented evidence of future profits may be admitted and its weight should be left to the fact-finder. *Harsha*, 346 N.W.2d at 798. Thus, the question is whether a prospective loss of net profits has been shown with reasonable certainty. *Id.*; *G & H Soybean Oil*, 796 F.Supp. at 1217.

■ After reviewing the record, we reject the hospital's claim that EBP should be barred from recovery because the hospital was unaware of the magnitude of the profits EBP expected to derive from the sale of life insurance at the employee benefit seminars. Iowa law focuses on the foreseeability of the type of damages. *Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Iowa 1991). In this case, lost profits from insurance commission sales were reasonably foreseeable. The hospital knew EBP charged $28.50 per employee for benefit seminars that did not provide an opportunity to offer insurance, and charged only $5 per employee if insurance was offered. It should therefore, have reasonably recognized EBP's primary source of profits was commission from insurance sales. Moreover, the hospital knew the anticipated commissions from the sale of life insurance were underwriting the costs of preparing the benefit statements.

■ Whether EBP showed a prospective loss of net profits with reasonable certainty presents a closer question. At the time of trial, EBP had been in business for only three years, had conducted three small benefits presentations, and had never made a profit. EBP, however, presented evidence of its insurance sales commissions, enrollments, and lapse rates from the three benefits presentations it had completed. Two of these

presentations were made to hospitals. The hospitals' employee structures were similar to that of Des Moines General, and a similar insurance product was sold to them. From this data, EBP projected its expected profits at Des Moines General and subtracted its variable expenses. EBP also presented evidence of Bruce's and Shipley's previous experience selling insurance and commitment to their new business. Additionally, Mr. Haywood, an individual with extensive experience in the sale of insurance to employee groups, testified EBP's projected lost profits were extremely conservative.

■ EBP is only required to "present such evidence as might reasonably be expected to be available under the circumstances." *Netteland*, 510 N.W.2d at 167. We conclude the evidence they provided established a reasonable basis upon which the district court could determine lost profits. *See Ballard v. Amana Soc. Inc.*, 526 N.W.2d 558, 561 (Iowa 1995). We affirm the district court.

**AFFIRMED IN PART AND AFFIRMED BY OPERATION OF LAW IN PART.** See Iowa Code § 602.5106(1) (1995).

For affirmance: DONIELSON, C.J., and CADY, and HUITINK, JJ.

For reversal: HAYDEN, SACKETT, and HABHAB, JJ.

HABHAB and HAYDEN, JJ., concur in part and dissent in part.

SACKETT, J., dissents separately.

HABHAB, Judge, (concurring in part and dissenting in part).

I concur with the majority that an agreement was made and breached, but believe damages are too speculative to permit recovery under the new business rule. EBP had been in business for only three years, conducted only three benefits presentations, and had never made a profit. EBP's previous presentations were made to groups less than half the size of those planned for the hospital. EBP presented limited evidence of the statistical make-up of the previous groups, an important factor in gauging enrollment. There were also different dollar limits on the insur-

ance products sold at the previous presentations. In addition, the court discounted Mr. Haywood's testimony because he was a proponent of the type of insurance marketing EBP was engaged in. Finally, EBP presented no documentary evidence of profitability based on experience in the industry, or business records of similar enterprises.

HAYDEN, J., joins this concurrence in part and dissent in part.

SACKETT, J., joins this dissent.

SACKETT, Judge, (dissenting).

I concur with Judge Habhab that the evidence of damages was too speculative.

I disagree with Judge Habhab and the majority that there was substantial evidence supporting the finding there was a contract.

I would reverse and dismiss.