# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 01-3427

_____

| | | |
|---|---|---|
| Advantage Consulting Group, Ltd., doing business as Advantage International Integrated Recruitment Solutions, a Minnesota corporation organized under the laws of Minnesota, | * * * * * * * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| Carl Braun, as its President and General Manager, | * * | District Court for the District of Minnesota. |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| ADT Security Systems, Inc., a Delaware corporation, | * * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: June 10, 2002

Filed: October 4, 2002

_____

Before BOWMAN, FAGG, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

This diversity case involves a dispute over the payment terms of a recruiting contract between Advantage Consulting Group, Ltd. (Advantage) and ADT Security Systems, Inc. (ADT). ADT appeals from the district court's grant of summary judgment in favor of Advantage. We affirm in part, reverse in part, and remand.

I

ADT is a Delaware corporation that provides security services throughout the United States. Advantage is a Minnesota corporation that provides staffing and recruitment services for many companies. In May of 1999, ADT asked Advantage to recruit a pool of qualified candidates from which ADT could fill a number of positions in its mid-west region. The relevant provisions of the contract prepared by Advantage provided that

> Advantage International will fill a minimum of 187 positions for the contract rate between June 1, 1999 and December 1, 1999 . . . [Advantage] agrees to fill each position at a cost of $1750 per hire, for the Sales, Service Tech and Installer positions. All other positions are at a contract rate of $2500. There are 182 positions @ $1750 and 5 @ $2500. The total investment for this project would then be $331,000. A retainer of $55,166 would be due and payable on June 1, 1999 and the remainder paid in 5 equal installments (monthly) of $55,166 beginning on July 1, 1999 and concluding on December 1, 1999.[1]

> . . .

> Should ADT put the project on hold, cancel the remaining openings or for any reason decide to cancel the project other than for non-performance by [Advantage] (documented), there will be a program cancellation fee of $750 for every remaining position unfilled.

---

[1]We note the five monthly payments would have actually been completed on November 1, 1999.

ADT paid the initial retainer and three of the monthly installments for a total of $220,664. But after four months, or two-thirds, of the contract period had passed, ADT terminated the contract because it had filled just sixty, or less than one-third, of the 187 positions with Advantage's recruits. ADT refused to pay the $750 cancellation fee for each unfilled position, claiming non-performance by Advantage. ADT also claimed a refund for the amount it had paid in excess of the "$1750 per hire" contract rate for the sixty filled positions.

Advantage sued ADT in state court to collect cancellation fees of $95,250 ($750 x 127 unfilled positions). ADT denied the claim, counterclaimed for a refund of $115,664 ($220,664 less $1750 x 60),[2] and removed the case to federal district court. Following discovery, ADT moved for summary judgment on its counterclaim, arguing its four payments exceeded the amount owed because the contract set forth a specific rate of "$1750 per hire" for the sixty hires produced by Advantage. ADT also moved for summary judgment on the cancellation fees claiming it had documented Advantage's non-performance. Advantage resisted the motion, arguing it could keep all of ADT's payments because the contract called for six payments of $55,166 totaling $331,000, and included no provision for refunds should the contract be cancelled early. Advantage contended the contract's reference to "at a cost of $1750 per hire" merely referred to a method for calculating the total compensation. Advantage further claimed it was entitled to cancellation fees because ADT cancelled the contract for a reason other than documented non-performance.

The district court agreed with Advantage on both issues, concluding Advantage could keep the $220,664 ADT had already paid, and was entitled to another $95,250 in cancellation fees for a total of $315,914 for the 60 hires produced by Advantage. The district court concluded the contract referred to a "cost per hire"

---

[2]Both parties based their requested amounts of relief on the $1750 rate, without regard to the five positions at the $2500 contract rate, and so we do the same.

formula merely to justify the total contract price, and that the absence of terms addressing a refund showed no refund was contemplated should ADT cancel the contract early. The district court also held that ADT had not shown sufficient documentation of non-performance to create a genuine issue of material fact for trial on the cancellation fee. ADT challenges both of the district court's conclusions on appeal.

## II

The first issue is whether ADT is entitled to a partial refund of its $220,664 payment. We review the district court's construction and interpretation of the contract de novo, giving no deference to the district court's interpretation. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996). The parties agree Minnesota law applies. Under Minnesota law, a "contract must be interpreted in a way that gives all of its provisions meaning." Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995). The court must consider the overall purpose of the contract, as well as its terms. Clapp v. Haferman Water Conditioning, Inc., 380 N.W.2d 838, 841 (Minn. Ct. App. 1986). The contract's terms will not be construed so as to lead to a harsh or absurd result. Brookfield Trade Center, Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998).

ADT contends the parties contemplated that ADT's cost, and Advantage's compensation, would be based upon specified dollar amounts "per hire." ADT claims the district court placed undue emphasis on the selected method of payment, without considering the terms on which those payment amounts were based. ADT argues the district court's interpretation cannot be reconciled with the contract's "per hire" and "contract rate" provisions, and renders those terms meaningless. We agree. The primary focus of this contract was not how much ADT would pay each month for Advantage's services. Rather, the primary focus of the contract was the number of

positions Advantage would fill and the cost "per hire" for each position, while the monthly schedule was merely the method of payment selected by the parties.

We reach this conclusion for several reasons. First, in the event of an early cancellation, the contract's terms cannot be reconciled under Advantage's construction. Advantage claims it can keep $220,664 for producing 60 hires, at a cost to ADT of $3677.73 per hire. That result conflicts directly with the contract language, because Advantage "agree[d] to fill each position at a cost of $1750 per hire."

"Where there is an apparent conflict between two clauses or provisions of a contract, it is the court's duty to find harmony between them and to reconcile them if possible." Oster v. Medtronic, Inc., 428 N.W.2d 116, 119 (Minn. Ct. App. 1988). "Apparent conflicts between clauses will be resolved by giving full effect to principal and more important clauses and subordinating thereto those of minor importance." Egner v. States Realty Co., 26 N.W.2d 464, 470 (Minn. 1947). We must decide, then, whether the "contract rate" and "per hire" provisions are the principal and more important clauses in this contract, or subordinate to the monthly payment schedule.

We believe the monthly payment schedule is subordinate to the "contract rate" and "per hire" provisions in the contract, not vice versa. The contract first addressed the "contract rate" and "per hire" costs for the 187 positions to be filled. Only later did the parties address the schedule of monthly payments. It makes sense that parties will address issues of more importance first, followed by those of less importance. Therefore, although a term's location in a contract is certainly not dispositive, it may be indicative, of intent. If the parties intended this contract to be one for six months of services with no direct relation to the results produced, rather than a contract for a "per hire" fee for each successful hire, we expect the parties would have *first* referred to the agreement as one for services at a set monthly rate of compensation, followed *later* (if at all) by a reference to how the compensation was calculated.

Second, "[e]ach and every provision of a contract must be given effect if that can consistently and reasonably be done." Oster, 428 N.W.2d at 119. Under Advantage's construction, the contract's references to "contract rate" and "per hire" fees served only as a means of calculating the total compensation. If that were true, those terms became surplusage as soon as the parties calculated the total compensation. Thereafter the means of calculation served no purpose, and it would have been unnecessary to include those provisions in the contract. We do not believe that to be the case, however, because the contract first referred generally to a "contract rate" for all 187 positions, then referred separately to two different "contract rates" — a rate of "$1750 per hire" for 182 Sales, Service Tech and Installer positions, and a "contract rate of $2500" for the remaining five positions. We doubt the parties would have singled out just five positions at a separate rate if the overall intent of the contract was merely to arrive at a monthly amount to pay Advantage for its services, without relation to the positions actually filled.

We can, however, give meaning to all the contract's provisions under ADT's construction. If we recognize the "contract rate" and "per hire" provisions as the principal and more important clauses in this contract, the monthly payment schedule still serves a purpose. The schedule allowed ADT to spread its obligation to pay over time. It also allowed Advantage to cover operating expenses while performing services, without having to wait until the entire contract was performed before receiving any payment. But we do not believe the monthly payment schedule was the essence of the parties' agreement. We therefore must give full effect to the contract's "per hire" and "contract rate" provisions at the expense of the subordinate payment schedule. We do that by recognizing the implicit understanding that, in the event of an early cancellation, ADT would receive a refund should its monthly payments exceed the "per hire" amounts agreed to under the contract. See Closuit v. Mitby, 56 N.W.2d 428, 432-33 (Minn. 1953) (recognizing that implied contract terms are as much a part of the contract as its express terms so long as the implication "result[s]

from the language employed in the instrument or [is] indispensable to carrying the intention of the parties into effect").

Third, the cancellation fee provisions of the contract are duplicative if the parties intended Advantage to keep the monthly payments in the event of an early cancellation. Advantage contends the cancellation fee provisions protected the significant investment it made in the contract in the event ADT canceled for some reason other than Advantage's non-performance. We agree those provisions accomplished that purpose. But if, in fact, the parties' overall intent *ab initio* was simply to calculate the total value of services Advantage would provide over a six month period, so that Advantage could be paid for those services on a monthly basis, there would be no need for a cancellation fee. The investment Advantage made each month would already be protected, because it would keep the payment for the services performed each month.

Fourth, we must construe the contract's terms so as to avoid absurd results. Brookfield Trade Center, 584 N.W.2d at 394. Advantage's construction of the contract leads to absurd results, with Advantage penalized for performing well and unduly rewarded for performing poorly. For example, Advantage's counsel conceded during oral argument that its interpretation would allow ADT to cancel the contract after one month without penalty if Advantage had already produced all 187 hires. The $750 cancellation fee would obviously not apply because there would be no remaining positions unfilled. Under that scenario, Advantage would receive just the initial $55,166 retainer for being 100% effective in one-sixth the time, and ADT would get the entire benefit of the contract at a cost of just $295 per hire.

Conversely, if the contract were cancelled after five months of service had produced just ten hires, Advantage's interpretation would allow it to keep $275,830 ($55,166 x 5) in monthly payments for a whopping $27,583 per hire. If we further assume the cancellation fee applied because ADT could not "document" non-

performance, Advantage would get an additional $750 for each of the remaining 177 unfilled positions. Under that scenario, Advantage would receive a total of $408,580 for being 5% effective. The parties could not possibly have intended such a wide, and irrational, variance in Advantage's compensation in the event of an early cancellation.

Finally, a "contract is ambiguous if its language is reasonably susceptible of more than one interpretation." Current Tech. Concepts, 530 N.W.2d at 543. ADT's contention that the contract provides for a set "per hire" fee tied to Advantage's actual performance in the event of early cancellation is clearly reasonable. If we assume for argument's sake that the contract is also reasonably susceptible to the meaning Advantage ascribes to it, the contract would be ambiguous because an early cancellation creates a conflict between the "per hire" provisions and the monthly payment schedule. "If a contract is ambiguous, it must be construed against its drafter." Id. Because Advantage drafted the contract, Minnesota law requires us to construe the ambiguity against Advantage in any event.

The overall purpose of this contract was for ADT to pay Advantage a set price for each successful hire, with an additional penalty at a set price for each unfilled position if ADT canceled the contract early for some reason other than Advantage's non-performance. Nothing in the contract indicates the selected method of payment was intended to alter the parties' basic agreement for a set "per hire" fee. The terms of the contract show the parties intended both the compensation and cancellation fees to be based on the same measure, that is, the number of positions filled or unfilled. We therefore conclude the district court erred in dismissing ADT's counterclaim for a refund of $115,664.[3]

---

[3]In its counterclaim, ADT also contended Advantage should indemnify it for a $2430 judgment one of Advantage's subcontractors obtained against ADT in conciliation court. We find no error in the district court's resolution of this claim, and affirm the dismissal of this portion of the counterclaim for the reasons stated by the

## III

The second issue is whether ADT should pay a $750 cancellation fee for each of the 127 positions remaining unfilled when it terminated the contract, or whether it owed no cancellation fees because it could "document" Advantage's non-performance. ADT first contends the district court erred in granting Advantage summary judgment on this issue because Advantage never brought a cross-motion for summary judgment in response to ADT's motion. We disagree.

> A court has inherent power to grant dispositive motions sua sponte so long as the losing party was on notice that she had to come forward with all of her evidence. A grant of summary judgment is proper only where the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be entered. The propriety of granting summary judgment sua sponte turns on proper notice to the nonmoving party and an opportunity to respond.

McClure v. Am. Family Mut. Ins. Co., 223 F.3d 845, 856 (8th Cir. 2000) (internal citations and quotations omitted). ADT had a full opportunity during the summary judgment proceedings to demonstrate a genuine factual issue regarding Advantage's "documented" non-performance, and the facts and law related to the cancellation fees were fully argued by the parties. Therefore, the district court could permissibly grant summary judgment in Advantage's favor if, in fact, ADT failed to satisfy its initial burden of coming forward with sufficient evidence to present to a jury. See Madewell v. Downs, 68 F.3d 1030, 1050 (8th Cir. 1995) (upholding *sua sponte* grant of summary judgment in favor of non-movants where both facts and law relating to disputed claim were fully argued by the parties).

---

district court. See 8th Cir. R. 47B.

ADT next contends it came forward with sufficient evidence of Advantage's "documented" non-performance to survive summary judgment. Again, we disagree.

ADT relies upon two different groups of evidence to prove Advantage's "documented" non-performance. First, ADT relies upon emails it sent to Advantage expressing its dissatisfaction with Advantage's performance. ADT points to provisions in the contract which guaranteed "TOTAL customer satisfaction," and points out that Minnesota courts have enforced contracts which require one party to perform "to the satisfaction" of the other. E.g., Stellar v. Thomas, 45 N.W.2d 537, 542-43 (Minn. 1950). The district court correctly concluded the email evidence did not create a genuine issue of material fact for trial.

Minnesota's enforcement of so-called "performance criteria" contracts is nothing more than a recognition that a party's "satisfaction" will be determined under an objectively-reasonable-man standard, and not on the basis of the contracting party's own subjective standard. See Stellar, 45 N.W.2d at 543. Thus, ADT cannot prove Advantage's non-performance merely by alleging and "documenting" its own subjective dissatisfaction. ADT argues its dissatisfaction was objectively reasonable because two-thirds of the contract period had passed, but Advantage recruits had filled less than one-third of the positions. The contract provided, however, that Advantage may not be "on track to fill the required number of positions within the established timeframe," and if so, Advantage promised to "assign additional staff to the project at no additional cost to ADT, to ensure timely completion." Since the parties specifically contemplated that Advantage may not be "on track" in filling the positions, ADT must point to something more than that to "document" Advantage's non-performance.

Second, ADT relies upon its documentation of minor mistakes Advantage and its advertising agency made while performing the contract. In August 1999, Advantage ran an ad in an Indiana newspaper incorrectly stating the compensation

-10-

range for ADT installers was $10 to $15 an hour, when in fact the correct compensation range was $8 to $14.50 per hour based upon experience. This evidence did not create a triable issue of fact either. It is undisputed that Advantage continued to "perform" the contract, despite making minor mistakes during performance.

Since ADT was unable to document Advantage's non-performance, the contract's cancellation fees applied, and the district court properly granted summary judgment in favor of Advantage.

IV

We affirm the district court's judgment in favor of Advantage on its claim for $95,250 in cancellation fees. We reverse the district court's judgment in favor of Advantage on ADT's counterclaim for a refund of $115,664, and remand to the district court for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.